UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:                          . | Chapter 11 |
|                                 . |  |
|                                 . | Case No. 22-10635 (BLS) |
| ASTECH ENGINEERED PRODUCTS,     . |  |
| INC.,                           . |  |
|                                 . |  |
|                                 . | Courtroom No. 1 |
|                                 . | 824 North Market Street |
|                                 . | Wilmington, Delaware 19801 |
|                                 . |  |
|      Debtors.                   . | Friday, July 22, 2022 |
| . . . . . . . . . . . . . . . . . | 11:00 a.m. |

TRANSCRIPT OF FIRST DAY HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For the Debtors: | Thomas Horan, Esquire |
| | Marla Benedek, Esquire |
| | COZEN O'CONNOR |
| | 1201 N. Market Street, Suite 1001 |
| | Wilmington, Delaware 19801 |
| | |
| | Matthew Wilkins, Esquire |
| | BROOKS WILKINS SHARKEY & TURCO PLLC |
| | 401 South Old Woodward, Suite 400 |
| | Birmingham, Minnesota 48009 |
| | |
| | |
| Audio Operator: | LaCrisha Harden |
| | |
| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | (302)654-8080 |
| | Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the U.S. Trustee:        Linda Casey, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, Delaware 19801

For Boeing:                  Sean Scott, Esquire
                             MAYER BROWN LLP
                             71 South Wacker Drive
                             Chicago, Illinois 60606

                             Ryan Bartley, Esquire
                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                             Rodney Square
                             1000 North King Street
                             Wilmington, Delaware 19801

For Pratt & Whitney:         Joshua Cohen, Esquire
                             DAY PITNEY LLP
                             195 Church Street, 15th Floor
                             New Haven, Connecticut 06510

                             Joseph Huston, Jr., Esquire
                             STEVENS & LEE LLP
                             919 North Market Street Suite 1300
                             Wilmington, Delaware 19801

For Spirit
Aerosystems:                 Dania Slim, Esquire
                             PILLSBURY WINTHROP SHAW PITTMAN LLP
                             324 Royal Palm Way, Suite 220
                             Palm Beach, Florida 33480

For ITP:                     Derek Abbott, Esquire
                             MORRIS NICHOLS ARSHT & TUNNELL LLP
                             1201 North Market Street
                             Suite 1600
                             Wilmington, Delaware 19801

INDEX

MOTIONS GOING FORWARD:                                      PAGE

Agenda
Item 1:    Motion of the Debtor for Entry of Interim        44
           and Final Orders (I) Authorizing the Debtor
           to (A) Maintain Its Bank Accounts and Pay
           Bank and Processor Charges and (B) Maintain
           Existing Business Forms; (II) Granting a
           Limited Waiver of the Requirements of
           Section 345(B) of the Bankruptcy Code, to
           the Extent Applicable; and (III)
           Granting Related Relief
           [Docket No. 15; Filed 7/20/22]

           Court's Ruling:                                  46

Agenda
Item 2:    Motion of the Debtor for Entry of Interim        47
           and Final Orders (I) Authorizing the Debtor
           to (A) Pay Prepetition Employee Wages,
           Salaries, Other Compensation, and
           Reimbursable Employee Expenses, and (B)
           Continue Employee Benefits Programs and
           (II) Granting Related Relief
           [Docket No. 16; Filed 7/20/22]

           Court's Ruling:                                  48

Agenda
Item 3:    Motion of Debtor for Entry of Interim and        50
           Final Orders (I) Authorizing Debtor to (A)
           Maintain Its Insurance Policies and Programs
           and (B) Honor All Insurance Obligations, and
           (II) Granting Related Relief
           [Docket No. 17; Filed 7/20/22]

           Court's Ruling:                                  51

MOTIONS GOING FORWARD:                                          PAGE

Agenda
Item 4:   Motion of Debtor Pursuant to 11 U.S.C.             53
          §§ 105(A) and 366 and Fed. R. Bankr. P.
          6003 and 6004 for Entry of Interim and
          Final Orders (I) Approving Debtor's
          Proposed Form of Adequate Assurance of
          Payment to Utility Companies, (II)
          Establishing Procedures for Resolving
          Objections by Utility Companies, (III)
          Prohibiting Utility Companies from Altering,
          Refusing, or Discontinuing Service, and
          (IV) Granting Related Relief
          [Docket No. 18; Filed 7/20/22]

          Court's Ruling:                                     55

Agenda
Item 5:   Motion for Entry of an Order (I)                   56
          Authorizing the Debtor to Redact Certain
          Personal Identification Information and
          (II) Granting Related Relief
          [Docket No. -19; Filed 7/20/22]

          Court's Ruling:                                     57


WITNESSES CALLED
BY THE DEBTORS:                                                PAGE

     DAVID RICHESON
     Cross-examination by Mr. Scott                           33


EXHIBITS:                                                      PAGE

David Richeson Declaration                                    32

(Proceedings commence at 11:04 a.m.)

THE COURT:  Good morning, all.  This is Judge Shannon.  I understand from the court reporter that necessary parties have joined.

This is a hearing in the matter of ASTECH Engineered products, Incorporated, Case Number 22-10635, a Subchapter V Chapter 11 filing.

I am in receipt of the petition, as well as a binder of first-day pleadings.  And I very much appreciate that.

I see Mr. Horan, counsel for the debtor on the Zoom room.  Good morning, sir.  It's good to see you.

Can everyone hear and see me clearly?

UNIDENTIFIED:  Yes, Your Honor.

THE COURT:  Great.

UNIDENTIFIED:  Yes, Your Honor.

THE COURT:  All right.  So I think, with that, I would be happy to start moving forward and get any guidance and then we can deal with our motions.  But Mr. Horan, you have the virtual podium.

MR. HORAN:  Thank you, Your Honor.  Good morning.  It's Thomas Horan from Cozen O'Connor, proposed counsel for the debtor.  I'm joined at the hearing this morning (indiscernible) Matt Wilkins from Brooks, Wilkins, Sharkey & Turco firm, and also, I have my colleague Marla Benedek on

the line, as well.  And Mr. Wilkins (indiscernible)

THE COURT:  Mister --

MR. HORAN:  (Indiscernible)

THE COURT:  Hang on.  Mr. Horan, you're cutting out just a little bit.  It might be a microphone thing because the video seems to be fine, so maybe get a little closer.  But otherwise, I can mostly hear you, but every once in a while, you cut out for a word or two.

MR. HORAN:  (Indiscernible) Your Honor.  We filed these cases on Friday, last Friday.  And the motions that you're going to hear this morning (indiscernible) first-day motions, but they seek the sort of typical relief that you'd see filed with first-day motions.

I'm going to hand the podium over to Mr. Wilkins first, and he's going to do a deep dive.  He's going to -- in addition, Your Honor, I should have mentioned that Mr. David Richeson, who is the executive chairman of the debtor, is also on.  He's our declarant and he'll be available to Your Honor.

And after Mr. Wilkins' presentation of the background of the case and a few of the motions, Ms. Benedek is going to make a -- make presentations to you on the final two agenda items.  And this will be Ms. Benedek's first appearance before this Court, Your Honor, so please go gentle.

(Laughter)

THE COURT:  That sounds fine.

And Ms. Benedek, welcome, and I'll be happy to hear from you at the appropriate point in the hearing.

Before we turn to Mr. Wilkins, I do note that Mr. Richeson is here and I did have an opportunity to review his first-day declaration.  But before we go into the specifics of that, do we have, Mr. Horan, anybody from the Office of the United States Trustee or do we have a Sub V Trustee appointed in this proceeding yet?

MR. HORAN:  Yes.  Yes, Your Honor.  Linda Casey is representing the Office of the United States Trustee, and she is on the line with us.  And Mr. David Klauder is the Subchapter V Trustee in the case, and he is also on the line.

THE COURT:  Great.  I see that you folks both just appeared.  I apologize, I didn't look at the sign-in sheet before I walked in, so I wanted to make sure that I had backup in this exercise.  So it's good to see both of you. And of course, I appreciate your engagement with the debtor in the process and I will look forward to hearing from you in the hearing, as well.

But I think, right now, Mr. Horan, your suggestion was that Mr. Wilkins would give us some guidance on the company and where we're headed.

MR. HORAN:  Yeah.  And just before he does, Your

Honor, I'll note that, during the early part of this hearing, we'll be filing certification of counsel with clean and redlines of several of the orders, and the changes on those orders are responsive to Ms. Casey's comments.  So I apologize that we just weren't able to get those together for you before the hearing --

THE COURT:  No --

MR. HORAN:  -- but I'm sure we can move through those.

THE COURT:  Yeah.  No worries.  That sounds fine. Are there -- to your -- to the best of your knowledge, Mr. Horan, are there any open issues or contested matters for purposes of this morning?

MR. HORAN:  No, I don't believe there are, Your Honor.

THE COURT:  Okay.  Well, that's a good way to start a Friday.

Mr. Wilkins --

MR. HORAN:  It sure is.

THE COURT:  -- welcome.  Good to see you this morning, sir.

MR. WILKINS:  Thank you, Your Honor.  I am Matt, Matthew, Wilkins of Brooks, Wilkins, Sharkey & Turco, in Birmingham, Michigan, where I'm sitting right now.  We are proposed co-counsel for the debtor.  Along with my partner

Paula Hall and Mr. Horan and his firm, I'll be representing the debtor in this proceeding.

I appreciate and thank you for the opportunity to be admitted and -- *pro hac vice* and to practice in front of you.  It's a privilege and I take it seriously.  And I also thank you for hearing our five additional motions on what is an expedited basis.

I'd also like to thank and recognize the Office of the United States Trustee and Ms. Casey, in particular.  She has been super responsive and helpful so far in the case, and it's been nothing but a benefit.

And last, we look forward to working with the Sub V Trustee, Mr. Klauder.  I've already met with him by telephone.  And I believe, in this case, he will be actually a great asset and an integral part of it, so thank you.

Your Honor, we do have -- we do have five motions up --

THE COURT:  Whoops.  Hang on.

(Court and court personnel confer)

THE COURT:  Your -- all right.  Mr. Wilkins, are you able to hear me?

(No verbal response)

THE COURT:  All right.  Your -- I think your audio just cut out.  Can you ...

MR. WILKINS:  How about that?

THE COURT:  That's better, I got you.  We'll get --

MR. WILKINS:  You missed the best part.

THE COURT:  We'll get through this.  Yeah, I actually just denied all your motions, sorry about that.

(Laughter)

MR. WILKINS:  Touche.

Your Honor, I would like to give -- with your indulgence, give you a little bit of background on ASTECH and how we got here.

ASTECH is a Delaware corporation.  It operates in one facility in Santa Ana, California, and Santa Ana is near Los Angeles, but nearer to Anaheim and Disneyland and kind of that area.  It leases its one facility in a building that's about 300,000 square feet, it's very substantial.

ASTECH makes parts for jet aircraft, and these are complex, safety-critical, honeycomb panel products that go, for example, on engine exhaust bearings, panels, and flaps. Most of its products go to commercial aircraft, although some, in particular with our customer Pratt & Whitney, go on military planes.

ASTECH's largest customers are Boeing, Spirit Aero -- which is a supplier primarily to Boeing in our case -- ITP, which is England, and Pratt & Whitney, as I mentioned before.

The company has, give or take, 140 employees in Santa Ana.  It has not secured debt and no credit facilities. It operates on its collected receivables.

It was purchased from a large, multi-national conglomerate called GKN.  And as ASTECH's new management really dug into the --

THE COURT:  Actually, Mr. Wilkins, can I interrupt for just a second?

MR. WILKINS:  Please.  Please, Your Honor.

THE COURT:  Because I'm looking at Mr. Richeson's declaration, and I just want to make sure it's not a typo. Paragraph 10, at the beginning, says:

"ASTECH acquired the business from G Key N" -- "GKN in March of 2022."

Was that March of 2020 or March of 2022?

MR. WILKINS:  No, that's correct, Your Honor, just March of 2022.

THE COURT:  But then, down in Paragraph 11, it says:

"ASTECH convened an in-person meeting with its key customers in June of 2020."

Is that --

MR. WILKINS:  That is a typo.

THE COURT:  Oh, okay.

MR. WILKINS:  That should be June of 2022.  I

understand your -- I under -- I apologize, Your Honor.

THE COURT:  Okay.

MR. WILKINS:  Yeah, that's a typo.  Just last month.

THE COURT:  Okay.  That's fine.

MR. WILKINS:  So, Your Honor, continuing.  As ASTECH's new ownership really dug into the business and was able to -- was able to understand its operations and finances and how it would look as a standalone business, it became apparent that the business had, over time, but particularly now, become significantly unprofitable.

And while there are operational issues, undoubtedly, at the company, which management believes are fixable, it's clear that the real drivers of the unprofitability at this point are the contracts with its key customers and the fact that those contracts are, at present, underpriced.  And they're underpriced for a variety of reasons, some older, some relatively more recent.

Some of the contracts began quite some time ago. And even as they have been amended over time, over the years, the current cost to produce the parts for our customers has far exceeded and far outpaced the price that ASTECH is contractually obligated to sell them for.  And it's crystal-clear that, over the last several years, and in 2022 in particular, inflationary pressures have had a severely

negative impact on this business.

The cost of everything has risen really exponentially, far more than -- at rates far more than what's usually foreseeable when these contracts were signed. And for example, you know, labor, raw materials, really everything has gone up. And I'm sure Your Honor sees that routinely in cases before you.

As just one example, the price of titanium -- and this may be more than you want to know, but I think it is --

THE COURT: No, it's -- actually, this is exactly what I want to know. I love this stuff.

MR. WILKINS: It is, it is kind of indicative. The price of titanium, which makes up over 50 percent of ASTECH's raw material costs, is currently 75 percent higher than it was in March of this year, March of this year. And it's actually come down, it was 150 percent higher in May of this year. Historically, titanium -- I was looking at this -- titanium sells for roughly $4 a kilogram. Now it's almost $14, so --

THE COURT: Wow.

MR. WILKINS: -- the cost of everything, and that one in particular, have gone up and up and up and up.

As we indicated in -- with the typo -- in Mr. Richeson's declaration, to be transparent with our customers, we assembled them and invited them to a meeting last month to

start discussions with them on the financial challenges facing the company and we sought their assistance, and those discussions are ongoing.  And I see -- I've spoken with counsel for, I think all the customers now, and I see a lot of them on this call.  And we appreciate the company -- their clients and their input and help in trying to help us work through this.

Before getting on with the motions, Your Honor, I welcome any questions.  I do have Mr. Richeson here available, if you have any questions on sort of the factual background I've laid out.  I'm happy to respond to them. Otherwise, I'll move forward with our motion.

THE COURT:  No, I do have some questions for Mr. Richeson, and that -- hopefully, they warned you a little bit that this might happen.  But the -- we're not going to go ahead, at least at this point, and swear you in, although you should regard yourself as being under oath.  I'm just -- I like to get to -- get some understanding of the nature of the business that's operating before me and get a sense of the challenges that you're facing.  And again, I appreciate getting the additional context from Mr. Wilkins.

But when we talk about the product that you make, Mr. Richeson -- and again, if this is stuff that's not squarely in your wheelhouse, it's a discussion that we can have at a later hearing with operations personnel.  But Mr.

Wilkins touched on titanium as being half of your raw material source.  Can you describe for me a little bit the products that you make and what they're used for?

MR. RICHESON:  Good morning.  This is Dave Richeson and I'm very pleased to be here this morning and appreciate the questions.

So the products are part of the exhaust system on -- on very large aircraft, 767 tankers that are supplied to the U.S. Military --

THE COURT:  So those are the --

MR. RICHESON:  -- (indiscernible)

THE COURT:  Are they the KC135s or they're the new ones?

MR. RICHESON:  No, this is the newer one --

THE COURT:  Okay.

MR. RICHESON:  Seven six -- yeah, it's based off of the 767, the Boeing --

THE COURT:  Okay.

MR. RICHESON:  -- 760 (indiscernible)

We also supply the exhaust system for the 747-8.

And then we're supplying parts to ITP Rolls Royce that go on the Airbus A350, as well as a number of military aircraft.

And then to Pratt & Whitney, are part of the flap systems that are supplied.

And so there's a series of products.  They're made out of titanium and they -- a small series of very intricately welded strips that are honeycomb patterns inside these titanium pat -- panels.  And they provide both thermal and acoustic properties for the jet engines and support the exhaust and the engine points.

THE COURT:  So the honeycomb structure with titanium gives you relative lightness and stiffness?

MR. RICHESON:  Yes, lightness, stiffness, and both acoustic and thermal properties.

THE COURT:  You mentioned that these are welded in strips.  I -- is 3-D printing part of the manufacturing process, or is that something that's in the mix?  I just don't know and I'm curious and I get to ask any question I want to ask.

(Laughter)

MR. RICHESON:  Absolutely.  No, sir, the -- there is no 3-D printing today as part of this process.  These are produced on machines that were originally developed in the 1960s, and it takes a very small strip of titanium.  It then crinkles that into -- it's kind of a sine wave pattern.

THE COURT:  Uh-huh.

MR. RICHESON:  And then those are laid in between the two honeycomb -- or two pieces of titanium and welded together, and that's the base of it.  Then they are formed

and shaped into curvatures to fit the -- the exact design of the aircraft exhaust system.  Then they have to go through welding processes and operations.  They have to go outside for coating, being brought back in.  And it's very intricate handwork, for the most part.  These are low automation processes, for the most part.

THE COURT:  And so I assume that you would regard your employee base as highly skilled and experienced.  Is that --

MR. RICHESON:  Yes, sir.

THE COURT:  Okay.

MR. RICHESON:  They are very, very highly skilled and experienced and not easily replaced in the marketplace.  We can't just bring anybody in to run one of the pieces of equipment.

THE COURT:  So I think I've heard of all of your major customers, I certainly have heard of all of your major customers, and I think I have a sense of this.

Let me just ask, before we turn to some specifics.  The exhaust systems are on or visible as part of the engines.  If I'm on a -- if I'm on a passenger jet and I'm behind the wing, I can see, that's the exhaust system from the engine.  Do I have that right?

MR. RICHESON:  That's correct.

THE COURT:  Okay.

MR. RICHESON:  Yes, when you are looking at the back of the engine and you see the fumes coming out of the back fo the engine, that's the exhaust system.

THE COURT:  And obviously, that's ferociously hot and really loud.  So the idea is that the products that you provide help manage both of those aspects.

MR. RICHESON:  Yes, sir, that is correct.

THE COURT:  Okay.  Can you tell me who your competitors are in this -- in what it is --

MR. RICHESON:  So --

THE COURT:  -- that you do?

MR. RICHESON:  In exactly what we do, there are no competitors.

THE COURT:  Okay.

MR. RICHESON:  There are people in the business that make somewhat similar products, but not the same technology, though -- not provide the same acoustic and thermal principles that ours does.  There's a company called Safran, which would probably be the closest similar competitor today.

THE COURT:  I've had a number of cases over the years that involve the aerospace industry in one capacity or another.  But it seems to me that, in some ways, it's somewhat analogous to the tier one, tier two, tier three structure in the automotive industry; that there are

specific, sometimes smaller manufacturers that are sole-source suppliers of particular products, and typically subject to contracts or a situation where they have sometimes only one or two customers.  Is that somewhat analogous to what you're looking at?

MR. RICHESON:  We -- yes, sir, it is very similar. And I spent about 35 years in the auto industry, so understand the customer/supplier relationship very well in that space, and I would say that this is very similar.

THE COURT:  Okay.  No, I appreciate it.  And I very much appreciate getting the context of this.  As I said, I spend most of my time talking to lawyers, so I like to talk to people that actually do something every once in a while.

(Laughter)

THE COURT:  And ...

MR. RICHESON:  Well, we've got 140 other people that do that.

THE COURT:  Well, I appreciate that, and hopefully I'll get a chance to learn a little bit more about precisely what it is that you all do.

I think, turning back then to Mr. Wilkins, I've gotten at least the -- a little bit more depth on what it is that the company is doing and I can imagine some of the issues.  We're talk about what it is you're looking to accomplish in the case.  But if you wish, I'm happy to turn

to the motions.

MR. WILKINS:  Thank you, Your Honor.  I will go through them in the order that --

THE COURT:  Actually --

MR. WILKINS:  -- that they are --

THE COURT:  -- Mr. Wilkins, I see that Mr. Bartley has raised his hand in the Zoom room.  And it might make sense at this point -- if we were live, I would have taken appearances from various parties at this point.  So I think, before we turn to the motions -- which Mr. Horan correctly noted are certainly familiar to the Court and pretty routine -- if there are parties that wish to be heard, I'd be happy to hear and get any further context I can.

Mr. Bartley, we'll start with you.  Good morning and good to see you.

MR. BARTLEY:  Good morning.  Likewise, Your Honor.  Ryan Bartley of Young, Conaway, Stargatt & Taylor, appearing for Boeing Corporation in this matter.  Your Honor, I'm joined with Sean Scott of Mayer Brown, who we're serving with as Delaware counsel.  We did file *pro hac* papers for Mr. Scott and his colleagues, and I would like permission for him to appear and I would turn it over to him with that permission to make some statements.

THE COURT:  Of course.  And consistent with my practice, whether a *pro hac* motion has been filed or not, I'm

not going to stand on ceremony at the early stages.  I'm happy to hear from anybody that wishes to be heard.

Mr. Scott, I think I missed it.  Who are you and Mr. Bartley representing?

MR. SCOTT:  We are representing the Boeing Corporation, Your Honor.

THE COURT:  I've heard of it.

MR. SCOTT:  Good morning, Your Honor.  Sean Scott of Mayer Brown, LLP on behalf of Boeing, the Boeing Company. I believe that certain of the key customers would like to make some introductory remarks.

Boeing is one of -- what we understand to be one of the four key customers that are referenced in Mr. Richeson's declaration.  And while I appreciate Mr. Wilkins' discussion, we still have a number of questions about when and why this bankruptcy case was filed, whether it belongs in Subchapter V, if in bankruptcy at all, and what it's going to take for the debtor to successfully reorganize.

Obviously, it's a first-day hearing, not all those questions are going to be answered today.  But as Your Honor noted, I think, in the questioning, this is the filing of a company that was created through an asset acquisition four months ago, and that was an acquisition that our client was expressly asked to consent to.

In the context of that, various representations

about the solvency of the debtor, the capitalization of the debtor were made by members of the current management team, principals of the Ten Oaks Group, which is what we understand to be the sponsor entity here.  I haven't heard exactly anything yet to date about their role in these cases.  But the filing itself and the first-day declaration seemed, to us, to be materially at odds with some of those statements from four months ago.  And in particular, we're being told that the fundamental key customer contracts are and have been unprofitable in the range of three hundred to 600,000 per month; and, ultimately, that rehabilitating the debtor is going to be from customer concessions.

Given all of this, I heard Mr. Wilkins' comment about commodity pricing.  But I know that we -- and I think I speak, not only for the Boeing Company, but all the key customers -- we're trying to understand what has changed about this business from the time it was acquired in a carveout acquisition four months ago and the Chapter 11 filing on July 15.

I think some of the statements made in Mr. Richeson's declaration do raise threshold questions about how the business was capitalized, how it has been funded since it was acquired.  And we'd like to understand why a sophisticated entity like Ten Oaks acquired a company that, at least on the face of it, had these contracts in place.

It's not clear whether these were unprofitable and to what extent they were at the time.  But based on the declaration, there were -- there -- at that time, there were representations made to us that ASTECH was ready, willing, and able to perform.

So, Your Honor, I know some of those answers are not going to be gotten today.  We look forward to the role of the Subchapter V Trustee.  We know that there's going to have to be a constructive dialogue in good faith about how to fix the debtor.  But we have concerns about whether it's viewed as simply the customer's problem to solve for some of these issues.

To the extent that statements in the declaration are being admitted for purposes of the Chapter 11 declaration, I may have some directed questions for the declarant.  But Your Honor, I did want to put our position on the record.  I think some of the other customers may have some views that they want to add, as well.

THE COURT:  And I'm happy to hear from parties.  And thank you very much, Mr. Scott.  Let me make a couple of observations:

First, I do think it makes sense to have this discussion.  You know, obviously, the time line was the first thing that I noticed and focused on, and I appreciate the clarification from Mr. Wilkins regarding the time line.  So

it's obvious to me that there was a transaction and we're just a few months later and here we are.

But as you noted, this is a first-day hearing. So, you know, your concerns about the opportunity for discussion I fully expect will happen. I see many -- a number of familiar faces on the Zoom screen in front of me, as much as I hate Zoom.

But I want to be clear that, consistent with my practice, you know, there are discussions that occur. If there are issues with respect to exchange of information or cooperation -- I'm aware that, obviously, a debtor trying to get moving has a number of considerations before it. But I will observe that my practice has been, in terms of documents and briefing and some of the mechanics of administering the case, I'm not a fan of letters and motions relating to those things or to discovery. If you have issues, get me on -- get me on the phone.

The debtor has commenced a proceeding. It is obliged, I think, as a practical matter, to engage with its stakeholders and I expect that that process will play itself out.

Mr. Scott did touch on, I think, a good point. Obviously, we have Mr. Richeson's declaration as part of the debtor's case for purposes of the relief that's being sought today. I assume the debtor will move in a moment to have

that admitted into evidence, and then Mr. Richeson is obviously present in the courtroom virtually for purposes of cross-examination, if necessary, and I'm more than happy to permit that to occur.

But I would take a moment to allay or at least address, I think, what Mr. Scott may have hinted at, which is the significance of the admission of the declaration for purposes of perhaps further proceedings in this case.  And in that respect, the Court has, I think, been consistent for many, many years that a first-day declaration is admitted exclusively at the first day for purposes of the relief that's being sought in the court on an interim basis and particularly with a narrow package such as this.

And I've made observations in the past, and I'll make them again, that parties should not be concerned that the admission of the declaration or a failure to object or to cross at this stage will lead to certain facts or representations and that declaration being taken as binding, law of the case, or some conclusive facts.  This is a declaration for purposes of introducing the debtor and the case to the Court and for the facts that are necessary, again, for the narrow relief.

Again, parties are welcome to cross-examine.  But I do want to provide assurances that nobody is going to get blindsided at a subsequent hearing to say, you know, you

didn't ask or object to this and this has been admitted.  I think that's intuitive to folks, but I do think it's also important to note that on the record because, again, it's a first-day hearing.  People have not had a full opportunity, there have been no depositions, I assume.  And so, again, I think it's clear and helpful, I think, to share with the parties how the Court views the functionality of a first-day declaration at the first-day hearing.

And of course, you know, at any point throughout the balance of the proceedings, either today or at other points, Mr. Richeson has a declaration submitted under oath and can be cross-examined on that at a later point, if necessary, but that door remains open.

And I hope that that's responsive, Mr. Scott, to what I think may have been at least one of the points that you touched on.  Is that fair?

MR. SCOTT:  That is fair and it is responsive, Your Honor.

I do think some of our questions go to the case background, so I -- but I do appreciate the clarification on the evidentiary weight of the first-day declaration.

THE COURT:  Great.  And again, I'm at your pleasure.  The declaration is going to be admitted at some point this morning.  And parties, if they wish to cross-examine, will be afforded an opportunitiy to do so, if they

need to do so.

Mr. Huston, good morning.  I see your virtual hand is up.  Good to see you.

MR. HUSTON:  Good morning, Your Honor.  And it's a pleasure to see you, long time.  May it please the Court, Joseph Huston of Stevens & Lee, and with my is my colleague from Day Pitney, Joshua Cohen.  We represent two names you may also have heard of, which is the Raytheon Corporation and Pratt & Whitney.  And Mr. Cohen has a couple of comments that he'd like to share with Your Honor.

THE COURT:  You are correct, Mr. Huston, I've heard of those -- I've heard of the company.  You know -- and again, I don't think this is a secret -- I love this stuff.  The only thing I would like better, if it were rockets, but otherwise ...

(Laughter)

THE COURT:  Otherwise, you have my --

MR. HUSTON:  We might be able -- we might be able to indulge you on that.

THE COURT:  You know, that's a whole separate discussion.

But Mr. Cohen, good morning and welcome.

MR. COHEN:  Good morning, Your Honor.  And thank you for allowing me to address the Court this morning.

I have -- I don't want to repeat what Mr. Scott

has said, and he eloquently, you know, raised the issues that I think are appropriate for all of the key customers here.

I did just want to, you know, bring to the Court's attention -- and it's been -- Mr. Wilkins referenced it briefly -- you know, one other sort of background point here, which is that the contracts between the debtor and Pratt & Whitney relate to government projects, and that some of those contracts fall within the Federal Defense Priorities and Allocation Systems Program and have national security implications. So we're -- on the Pratt & Whitney side, we're dealing with government contracts and military and national security issues, to some degree here.

THE COURT: All right. I certainly appreciate the heads-up. I have dealt with those issues at different times and would be happy to deal, obviously, with those issues by or through your client; or, if the United States chooses to appear in the proceedings, they know how to find us, as well. But I appreciate --

MR. COHEN: Very well. Thank --

THE COURT: -- the heads-up.

MR. COHEN: Thank you, Your Honor.

THE COURT: Sure.

I see Mr. Abbott has joined. Good morning, sir. Welcome.

MR. ABBOTT: Yes, Your Honor. Thank you. Derek

Abbott of Morris Nichols.  Your Honor, I'm here on behalf of ITP and its parent.

Your Honor, as Mr. Wilkins suggested, ITP is a significant customer of the debtors and they're a significant supplier of ours.  We'd like to be able to continue doing business with them, Your Honor, and we're hopeful that that will happen.  We share -- we're a little puzzled, frankly, about the timing and strategy for the filing, but today is not the day for that.

I want to say at the outset, Your Honor, that we do support the company's continued operations and certainly the relief that they've requested today that will allow them to do that.  We have -- you know, further, Your Honor, we hope and expect to work constructively with the debtors throughout this process, or debtor.

We've been in touch with Mr. Wilkins, as he indicated.  And that's borne some fruit already, Your Honor.  We understand there is a significant amount of finished good products that are ready for delivery.  We intend to accelerate payments and pick up a substantial amount of that product in the next day or two, on some sort of COD or similar arrangement, largely through Mr. Wilkins' good offices.  And we greatly appreciate that show of good faith, Your Honor, and look forward to working with him and all the professionals in this case, to try to find a happy ending, if

we can, Your Honor.

THE COURT:  Great.  Thank you very much, Mr. Abbott.

Does anyone else wish to be heard before we turn to the motions?  Ms. Slim, did you wish to be heard?

MS. SLIM:  Yes, Your Honor.

THE COURT:  Yeah.

MS. SLIM:  Good morning.

THE COURT:  Go ahead.

MS. SLIM:  Can you hear me?

THE COURT:  I sure can, yes.

MS. SLIM:  Okay.  Thank you.

I just wanted to briefly introduce myself, Dania Slim of Pillsbury on behalf of Spirit AeroSystems.

We're still getting up to speed, Your Honor, and so we're in the process of retaining local counsel, but just wanted to note that, you know, we share some of the same concerns raised by Mr. Scott.  But we look forward -- Spirit AeroSystems, that is, looks forward to working with the debtor and, if necessary, with the Subchapter V Trustee to find a workable solution that works for both parties.

THE COURT:  Very good.  Thank you very much, Ms. Slim.  I appreciate it.

MS. SLIM:  Thank you.

THE COURT:  All right.  I think, at this point,

unless there are other parties that wish to be heard, we probably should address Mr. Richeson's declaration.  Mr. Wilkins, do you wish to move that?

(No verbal response)

THE COURT:  Oh, you need to unmute, Mr. Wilkins.

MR. WILKINS:  A mind of its own.  Thank you, Your Honor.

I -- if I could -- Mr. Richeson is here, as I've said.  If I could ask him a few questions?

THE COURT:  Sure.  But why don't we admit the declaration, at least for starters, and then I'm more than happy to give you an opportunity for further examination, if you wish.

MR. WILKINS:  I was trying -- I was going to lay a foundation to admit it, but I'm happy to move its admission right now, Your Honor.

THE COURT:  I think my colloquy with Mr. Richeson from ten minutes ago is enough of a foundation for you.

Are there any objections to the admission of Mr. Richeson's declaration, again, consistent with the Court's comments a few moments ago, for purposes of the relief being sought in this proceeding this morning?

(No verbal response)

THE COURT:  Very well.  Mr. Richeson's declaration is admitted.

(Richeson Declaration received in evidence)

THE COURT:  The Court notes that there is the possibility that parties may wish to cross-examine.  Mr. Wilkins has asked for the opportune -- or did you want to elicit any more testimony or were you just laying a foundation for the --

MR. WILKINS:  I was --

THE COURT:  -- for the dec?

MR. WILKINS:  I was just -- I was just laying a foundation, Your Honor.  I'm prepared to move forward with the motions.

THE COURT:  Okay.  Mr. Scott, did you wish to take the opportunity to ask a few questions?

MR. SCOTT:  Yes, Your Honor, I would like to ask some directed questions of the witness.  To be clear, we do not oppose the relief sought in the motions today, but I do think it would be a benefit to the Court, as well as the participants, to understand some of the events leading up to the proceeding.  So I would, with your indulgence, Your Honor, ask a few questions of Mr. Richeson.

THE COURT:  Of course.

Mr. Richeson, if you would be kind enough to raise your right hand, and we'll have the court reporter swear you in.

(Pause in proceedings)

THE COURT:  Just a second.

DAVID RICHESON, WITNESS FOR THE DEBTOR, SWORN

THE ECRO:  Thank you.

THE COURT:  Please state and spell your last name for the record, please.

THE WITNESS:  David Richeson, R-I-C-H-E-S-O-N.

THE COURT:  Very good.  Welcome, sir, again.  And Mr. Scott, you may proceed.

MR. SCOTT:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SCOTT:

Q   Good morning, Mr. Richeson.  As you heard, I represent the Boeing Corporation -- the Boeing Company.

In your declaration, you state that you are the debtor's executive chairman.  How long have you served in that role?

A   As executive chairman, since the 1st of June.

Q   Did you have any relationship with the debtors -- with the debtor prior to the 1st of June?

A   I did, sir.  I was the chairman of the -- of the entity prior to the 1st of June.

Q   When did you first become involved with the debtor?

A   Well, technically, I became involved when the transaction was executed on March 11th.

Q   And how did you come to be involved?

A    I was contacted initially by the Ten Oaks Group and have worked with them as an operating partner for approximately six and a half months now.

Q    And what is the Ten Oaks Group's relationship to the debtor here?

A    So the Ten Oaks Group is a family office that is primarily two families that invest in corporate carveouts. They were the entity that originally, I believe, was in discussions with GKN and, subsequently, the customer base regarding a carveout transaction.

Q    And have you been an operating partner with Ten Oaks on other portfolio companies?

A    I have not.  This is my first engagement with Ten Oaks Group.

Q    Okay.  And as an operating partner, are you then also an employee of Ten Oaks?

A    I am not, sir.

Q    Do you receive financial compensation based on the performance of the Ten Oaks investment?

A    Yes, I do.

Q    I'd like to talk a little bit, Mr. Richeson, about the financing of the acquisition here.  You state in Paragraph 8 of your declaration that the debtor has no secured debt and operates using cash on hand and receivables collected from its customers.  Is that correct?

A    That is correct, sir.

Q    At the time of the acquisition, did the debtor anticipate obtaining any additional sources of cash to operate the business?

A    Yes, sir.

Q    And what were those anticipated sources of cash?

A    The anticipation was to go to the market and acquire an asset-based loan to supplement the ability of the business to make capital investments and advance the business forward.

Q    Did the company seek to obtain such an asset-based loan?

A    There were some initial conversations about it, but it did not move forward.

Q    Why did it not move forward?

A    We quickly recognized that the losses and the operational issues were greater than we anticipated them to be and felt that it would be unwise to try and advance forward and obtain an ABL loan that we did not think we could support.

Q    So, to be clear, the company decided not to pursue the financing sources --

A    Yes, sir.

Q    -- through an ABL loan.

A    That's correct.

Q    Thank you.

     Did ASTECH's owners put any capital into ASTECH at the

time of the closing, whether as a capital contribution or otherwise?

A    So the owner is ASTECH Holdings, and ASTECH Holdings did not put any capital investment into the business.

Q    Who is ASTECH Holdings owned by?

A    To be honest, I don't know technically who owns ASTECH Holdings.

Q    So, when you testified earlier -- and again, I'm just trying to clarify -- that -- the Ten Oaks investment, was that in ASTECH Holdings?

A    Matt, you'll have to help me, sir.  I don't understand, quite honestly, the --

MR. WILKINS:  I'm not sure I understand --

THE COURT:  I --

THE WITNESS:  If you could --

MR. WILKINS:  -- the question.

THE COURT:  Hang on.

THE WITNESS:  Yeah.

THE COURT:  I think, Mr. Richeson, your answer is I don't know.

THE WITNESS:  Okay.  Thank you, sir.  I don't know.

THE COURT:  And again, parties --

(Laughter)

MR. WILKINS:  Appreciate it.

THE COURT:  No, I'm not trying to be cute.  But you will answer Mr. Scott's questions to the best of your ability.  And obviously, Mr. Scott will have an opportunity to communicate with anybody he wants to reach out to at or after this hearing.

Mr. Scott --

MR. WILKINS:  Thank you --

THE COURT:  -- you proceed.

MR. WILKINS:  -- Your Honor.

THE COURT:  Sure.

MR. SCOTT:  Thank you, Your Honor.

BY MR. SCOTT:

Q    Just to close off that line of questioning, were there any capital infusions made into the debtor at any time from the acquisition date through the bankruptcy filing?

A    No, sir.

Q    Mr. Richeson, you state that ASTECH's management team performed a, quote:

"-- top-to-bottom analysis of its operations and contractual relationships with its key customers."

Was that analysis performed prior to or after the closing of the acquisition in March of this year?

A    Most of the diligence work was done post-close.

Q    And who on the management team conducted that diligence?

A    Originally, there was a CEO that was involved in the

business and he was conducting that analysis with his leadership team at that time.

Q    You said -- I think you said that most of the diligence was done prior to the closing.  Was there diligence done prior to the closing on the profitability of these contracts?

A    I don't know the answer to that, sir.

Q    And who were the key customers that were the subject of this review?  Is it the four customers --

A    (Indiscernible)

Q    Pardon me.  I'll allow you to answer the question.

A    Yes, sir.  The four major customers who are present today that we have been talking about.

Q    Okay.  And the contracts with those four key customers were all in place at the time of the acquisition closing, correct?

A    Correct.

Q    And many of these are long-term supply agreements that go many years into the future, correct?

A    Several years into the future, I would say, as opposed to "many."

Q    Other than seeking to have those customers renegotiate contracts, would you describe what efforts, if any, were made to address the profitability from an operational perspective?

A    Certainly.  There has been an ongoing effort right now to address scrap issues.  Scrap has been a major issue in the

facility.

We also have had initiatives right now to investigate and identify opportunities to improve labor performance, productivity in the organization.  We've been analyzing the headcount of the organization to determine if it is properly staffed to support the customers.

So there's a number of ongoing areas there that we have been looking at.

Q    And despite those initiatives, it is your view that the contracts for the four key customers are unprofitable in the range of -- if I'm doing the math correctly -- 3.6 million to $7.2 million per year.  Is that correct?

A    I can't comment on the exact math, but I can comment on -- on the fact that we have looked at the contracts and they are significantly unprofitable.  And we've submitted cash flow forecasts to all of the customers to demonstrate and support that.

Q    But just to be clear, you testified that the current pricing of the contracts has resulted in and continues to result in ASTECH losing approximately three hundred to 600,000 per month.

A    Yes, sir.

Q    Has ASTECH been complying with its customer contracts prior to the filing date?

A    With the exception of some temporary stops, yes.  We are

currently producing and have never stopped producing.

We did notify some customers that we had put them on ship hold.  We never ceased production.  At this point in time, we are shipping to everybody.

Q    Which customers did you place on ship hold?

A    All four of the customers who are here today and are the significant customers.

Q    And can you describe for me -- I'm not familiar with that term of art -- what is "ship hold"?

A    Ship hold means that we are producing product, but not shipping it to the customers.

Q    So the company decided not to ship product to customers at points in time prior to the filing date, correct?

A    That is correct, sir.

Q    And why did you make that decision?

A    So that we could get the customers to engage in discussions with us to try and resolve the profitability issues of the business.

Q    Did you ever submit a formal restructuring proposal to the customers?

A    We invited the customers to meetings in Detroit. During those meetings we presented the cash-flow forecast for the business.  We told them at that time we needed a price increase in decisions by the end of July.  And in addition to that asked them to accelerate payment terms to Net 30 to give

the company a better cash cushion so that it would be able to get through negotiations and discussions with the customers.

Only one of the customers engaged in discussions and worked with us on improving payment terms.  None of the others engaged.  And as we looked at cash deterioration determined that we would move the company into bankruptcy in order to be able to protect the assets and the liabilities that the company had.

Q     I am going to try and unpack that statement.  Did you -- you said -- I believe you testified that you asked the customers to accelerate payment terms.  Is that correct?

A     That is correct, sir.

Q     Did you provide a formal proposal to any of the customers of the contract terms that you would expect to see to allow the company to be profitable on the contracts?

A     We requested from the customer group, the four customers, a 51 percent price increase that would resolve the matter.

Q     Did you receive requests for information from any of the customers to help validate the request for pricing increase?

A     After several weeks we did finally receive a request for information from the Boeing Company.

Q     And have you complied with the request for -- have you responded fully to the request for information?

A      Not fully.  No, sir.

Q      Was there -- were there any material events between June 20th and July 15th that changed your liquidity forecast?

A      Material events in terms of the fact that the customers did not agree to the improvement in payment terms, yes.

Q      Was there a specific event that precipitated the filing on July 15th?

A      No.

Q      One last question.  In Paragraph 11 of your declaration you state that Astech's financial condition has continued to decline as forecasted.  Since you became involved with Astech was there any forecast that showed something other than a continued decline in financial condition?

A      Early in the process there were forecasts that said that we would be able to become cash-flow positive around the end of the year.

Q      Based on the contracts in place?

A      I didn't put the forecast together so I can't comment on the specific details.  And that was when there was a different CEO in place or a CEO in place that is no longer there.

        MR. SCOTT:  That's all I have for now, Your Honor. Thank you very much.

        THE COURT:  Okay.  Thank you, Mr. Scott.

        Again, with court stipulation regarding the

purposes of Mr. Richeson's first day declaration any other parties wish to cross-examine Mr. Richeson regarding the contents of his declaration?

(No verbal response)

THE COURT:  Very good.  Mr. Wilkins, did you have any additional direct that you would like to adduce?

MR. WILKINS:  No, Your Honor.

THE COURT:  Then -- look, obviously, there is going to be a fair amount for people in this case to talk about.  I am actually encouraged by the fact that the four main stakeholders are identified and, frankly, engaged with able counsel in the case.  My hope and expectation is that there will be discussions in order to try to move the matter forward.

Just as an editorial comment, before we turn to the motions, I have observed that the motions are fairly routine and, obviously, I will deal with them on the merits today.  But the court is not making any determination and I think that this is not inconstant with Mr. Scott's concerns.  I am not making any determinations regarding the filing, its circumstances or where this case is headed for purposes of the first day.

What we do in these proceedings is we get our arms around what the issues are.  Again, I feel like I am a good deal more informed then I was an hour ago.  I think, again,

the court looks to the parties to engage, offers to the extent that there are issues that can be addressed productively via phone call you can expect that the court will be a willing partner in that process.  Right now we have a narrow range of relief that we are looking to proceed with and we will turn to the motions.

MR. WILKINS:  Thank you, Your Honor.

In support of the motions the debtor does rely on the facts in law stated in them and also on Mr. Richeson's declaration which I believe you have admitted into evidence for the purpose of the first days.

Your Honor, I would like to address the debtor's motion for an order authorizing them to continue the use of their existing bank accounts and business forms, and also to pay some relatively minor bank fees.  The debtor has four bank accounts, all of them are Bank of America.  They have a main account into which everything is swept daily.  They have an operating account which takes all of their collections from which all disbursements are made.  They have a 401-K holding account and they also have a payroll account through which payroll funds flow.

The debtor believes that having to close these accounts and open new accounts would be extremely disruptive to their ordinary course business operations.  We believe that checks could be trapped in that process particularly

payroll checks.  If you can appreciate, I'm sure, it is our employees who we are trying to be most careful with.

THE COURT:  Okay.

MR. WILKINS:  More than that getting -- having new accounts put in place and having to have our vendors recode and particularly our customers recode and redirect their payables we believe would be significantly disruptive to the business.  Right now, for example, Mr. Abbott eluded to this, the company has significant anticipated receipts in process and in the pipeline, some of which are coming from overseas accounts and having to, again, recode and have them redirected at this particular point in time would work a true hardship on the company.

THE COURT:  Okay.

MR. WILKINS:  Our CFO, whose name is Madison Adams, A-D-A-M-S, understands and assures me that he and his team can clearly demark pre and post account activity in these accounts without setting up the new accounts.  So, Your Honor, we would ask for authority to continue to use our existing bank accounts.

I will note that Ms. Casey from the U.S. Trustees Office had preliminary concerns on this relief. I have -- I think I have addressed them with her and she no longer has those concerns.

THE COURT:  All right.  Ms. Casey?

MS. CASEY:  Good morning, Your Honor.  I guess its morning for one more minute.  Linda Casey on behalf of the United States Trustee.

I did address with the debtors whether there was a need for this motion which is fairly standard, but it's unusual to have such few bank accounts.  We are not interposing an objection to the order at this time.  We did ask for one minor change which has been reflected in the order put up by certification of counsel.

THE COURT:  Very good.  Thank you.

Does anyone else wish to be heard with respect to the bank accounts and cash management motion?

(No verbal response)

THE COURT:  All right.  I'm going to grant the motion.  I note, as I have observed previously, that the relief requested here is actually common in this jurisdiction in connection with a corporate filing.  I don't disagree with Ms. Casey that we don't have a whole lot of bank accounts here, but that doesn't dispose of the issue from the court's point of view because as Mr. Wilkins noted and, frankly, from the court's long experience the risk of disruption associated with closing, operating and depository accounts and reopening them is significant and material.

So based upon the relief requested and based upon the allegations set forth in Mr. Richeson's declaration as

well as the court's long experience I will enter an order granting the motion.  The order will issue and we can move to the next motion.

MR. WILKINS:  Thank you, Your Honor.

I would like to turn to the employee wage and benefit program motion.

THE COURT:  Okay.

MR. WILKINS:  Here, Your Honor, the debtor is seeking authority to pay certain prepetition wages and related expenses in the aggregate amount of $115,740 on an interim basis with each employee being paid not to exceed $13,650 the statutory cap under Section 507(a)(4).  We're also seeking to continue uninterrupted our employee benefit programs.

This, for obvious reasons, is probably the most important motion we have today.

THE COURT:  Agreed.

MR. WILKINS:  Our 140 employees are really the lifeblood of this business.  They are highly skilled, very specialized and my understanding is, from speaking with management, that their skills, particularly in the geographic area they're in, are very much in demand.

The employees have been loyal and its management's view that they, in fact, want the company to succeed.  Many, if not most of them, depend on their paychecks from Astech to

live on and support their families.  Here, Your Honor, it is Astech's hourly employees who are paid in arears and they are the ones who have been caught in the bankruptcy filing and it is the $115,740 that will go to them.

THE COURT:  Okay.

MR. WILKINS:  So we are asking court approval to pay the aggregate up to that amount subject to the statutory cap.

If you have questions about that I'm happy to answer. I'm also happy to deal with the benefits aspect of this as well.

THE COURT:  No.  I have reviewed the benefits aspect of it.  My primary question would be whether Ms. Casey has had an opportunity to review this and whether she has any issue with the relief or the form of the order.

MS. CASEY:  Thank you, Your Honor.

I did have some comments to the form of the order and I understand a certification of counsel has been filed that  incorporates all of my comments.  We don't have any objection to the revised form of order.

THE COURT:  Okay.  That sounds fine.  I would ask if anyone wishes to be heard with respect to the debtor's wages and benefits motion.

(No verbal response)

THE COURT:  I am going to grant this motion and I

am certainly parroting Mr. Wilkins comments and observations. The fact is that I've said many, many times the court has no constituency for whom it expresses more concern especially at the outset of a case then those people that are looking to the company for payment of their wages and salaries.

Likewise, from the colloquy with Mr. Richeson, it's clear with even the limited understanding that this court has of the nature of the company's business that it has a skilled and necessary workforce that would be difficult to replace.  Again, it is a basic proposition that the court is particularly concerned with the welfare of those individuals.

So I am satisfied that the disclosures are appropriate and necessary.  Mr. Richeson's declaration touches on the need for this relief and, again, the court's long experience supports that observation that a debtor must pay its employees in order to expect to have some prospect of reorganizing.

I further note that the relief requested implicates Bankruptcy Rule 6003 in that it contemplates the payment of certain prepetition obligations within the first few weeks of the case.  Nevertheless, based upon Mr. Richeson's declaration as well as the court's observations from a moment ago, I am satisfied the debtor's reorganization would suffer the risk of immediate and irreparable harm in the absence of the relief requested.

The motion is granted and the order will issue.

MR. WILKINS:  Thank you, Your Honor.  Very much appreciate that.

Third, Your Honor, we have asked for court authority to continue our various company insurance programs and to pay up to $70,000 in insurance premiums in the ordinary course of business that the company believes will come due over the next 30 days.  Of course, for every company insurance is vital, but, you know, none more so then in the aircraft part manufacturing business, you know, where it's absolutely important.

Attached as Exhibit C to our motion is a summary of or a list of the various insurance coverages that the company has.  The annual total premiums are $912,000 -- this is 2022 to 2023, $912,065.  These include standard comprehensive commercial coverage, aircraft part manufacturing coverage, products, liability, environmental and really everything else.

I will point out it also particularly includes earthquake protection coverage which is something that is a higher priority there than in most locals of cases that I work on.  And that premium is not inexpensive, but there is earthquake coverage as well.  And Your Honor, I think, understands where this company is located so that is important as well.

THE COURT:  Sure.

MR. WILKINS:  Your Honor, we ask that the court authorize the debtor to continue its insurance programs as outlined in the motion and to pay, on an interim basis, up to $70,000 in premiums which we expect will come due over the next 30 days.

THE COURT:  Okay.  Does anyone wish to be heard with respect to the debtor's request for authority to pay and maintain its insurance programs?

(No verbal response)

THE COURT:  Very well.  I am going to grant the motion.  In so ruling I rely upon Mr. Richeson's declaration as well as the basic proposition that a corporation operating particularly in a manufacturing business under this court's supervision it's a basic proposition that it needs to have and maintain appropriate insurance.  I would further note that the Office of the United States Trustees operating guidelines likewise require that a debtor maintain appropriate insurance.

I appreciate getting the schedule of insurance that is attached as Exhibit C to the motion and I don't disagree with Mr. Wilkens that, obviously, every enterprise, and particularly a manufacturing enterprise, has its own particular insurance needs.  And in this instance earthquake insurance certainly seems like an appropriate consideration.

So I am satisfied that the relief requested is appropriate and warranted.  I would further note that the relief requested does potentially implicate Bankruptcy Rule 6003 in that it contemplates a payment of certain prepetition obligations within the first few weeks of the case.

Nevertheless, I am satisfied that the debtor's reorganization effort would suffer the risk of immediate and irreparable harm in the absence of the relief requested specifically were there a failure to maintain appropriate and necessary insurance.  The debtor would likely face significant either regulatory or legal proceedings in order to manage that process and that is an exercise that would, obviously, distract significantly from efforts to reorganize the company.  The motion is granted and the order will issue.

MR. WILKINS:  Thank you, Your Honor. It is very much appreciated.

I am going to, as Mr. Horan indicated at the outset, pass the baton to Ms. Marla Benedek who will address the utilities and adequate assurance motion and also the company's request to redact certain employee information if I may.

Thank you, Your Honor.

THE COURT:  Very good.  Ms. Benedek, good morning. Welcome.  It's good to see you.

I would observe that I think that I and my

colleagues have made this point, but we do try to make it at a stage where particularly clients are able to hear the court's commitment to ensuring that people have younger attorneys have an opportunity to participate in the proceedings.  So I am delighted that you have been given this opportunity and I am happy to hear from you this morning.  You may proceed.

MS. BENEDEK:  Thank you, Your Honor.  Good afternoon.  I appreciate the court's encouragement of young attorneys getting the opportunity to speak to the court.

The next item on the agenda is Item No. 4 which is the debtor's utility motion.  The motion seeks entry of an order prohibiting utility providers from terminating their services, approving the form of adequate assurance proposed by the debtor and approving certain procedures with respect to adequate assurance of future payment.

Based on a monthly average for the 12 months prior to the petition date the debtor estimates that the cost of utility services over the course of the next 30 days will be approximately $210,000.  That amount covers utility services including electricity, power, water, gas, waste management which are all essential services that allow the debtor to continue maintaining and operating its plant.

The debtor proposes to set aside an adequate assurance deposit in the amount of $141,300 which is more

than two weeks of the debtor's estimated go-forward utility costs.  The debtor is also seeking to establish procedures for utility companies to request additional assurance of future payment from the debtor if they find that the deposit made by the debtor is insufficient.  The debtor submits that the procedures that were proposed in the motion and are contained in the proposed order are standard for this jurisdiction.

One thing I would note is that Bankruptcy Rule 6003 is implicated by this motion and as set forth in the motion any interruption in utility services could cause immediate and irreparable harm to the debtor's estate.  As discussed in the first day motions and also in the first day declaration the debtor has one plant and has several key customers.  And any stop in the utility services could cause immediate and irreparable harm to the debtor's operations and also it could risk the debtor's non-compliance under contract with its key customers.

Accordingly, the debtor submits that the relief requested is necessary to avoid immediate and irreparable harm, and, therefore, satisfies Bankruptcy Rule 6003.  We circulated the motion and the proposed order to the U.S. Trustee and to the Subchapter V Trustee.  The U.S. Trustee provided some comments to us that we accommodated and included in the revised order and the redline that we filed

under certification of counsel.

I am happy to talk to you about those changes or walk through them with you, but once you look at the redline they're pretty self-explanatory. If Your Honor has any questions I am happy to address them.

THE COURT: No. I do not have any questions at this point. I would just ask to confirm with Ms. Casey that the proposed relief is satisfactory to your office.

MS. CASEY: Yes, Your Honor. With the revisions that the debtor has made it is satisfactory and we have no objection.

THE COURT: Very good. Does anyone else wish to be heard with respect to the utilities motion?

(No verbal response)

THE COURT: Very well. I'm going to grant the motion. I am satisfied that the relief requested is appropriate and warranted, and, likewise, it is entirely consistent with relief that I and my colleagues have granted in many, many prior cases.

Ms. Benedek has laid out the mechanics of the adequate assurance structure that will provide for an escrow or a set aside of just over $141,000. I believe that the structure that has been proposed by the debtor strikes an appropriate balance between a utility service provider's right to adequate assurance under Bankruptcy Code Section 366

and a debtor's need, and particularly a manufacturing debtor need for uninterrupted utility service.

The motion is granted.  The order will issue.

MS. BENEDEK:  Thank you, Your Honor.

The final item on the agenda is Item No. 5 which is the debtor's motion for authority to redact certain personal identification information from any paper filed and to be filed with the court in this Chapter 11 proceeding including the creditor's matrix.  This includes the home addresses of individual creditors including the debtor's employees as such information can be used to perpetuate identity theft or to locate survivors of domestic violence, harassment or stalking.

There are approximately 140 employees of the debtor which my co-counsel has mentioned earlier.  The debtor proposes to provide on a confidential basis an unredacted version of the creditor matrix and any other filings that are redacted pursuant to entry of an order on this motion to the bankruptcy court, to the U.S. Trustee, and upon reasonable request to the debtor or to the bankruptcy court to any party in interest.

In addition, the debtor will distribute to employee's home addresses any notices that are received of the debtor's corporate address and are intended for current employee.  As outlined in the motion with citations to recent

or current cases before this court granting motions to redact this type of personal information from public filings has become relatively routine in this jurisdiction.  And it has become increasingly important as cases of identity theft and issues with safety and security of non-debtor individuals rise.

We circulated this motion to the U.S. Trustee and the Subchapter V Trustee, and we didn't receive any comments from either.  So unless Your Honor has any questions then the debtor would respectfully request that the court enter the interim order.

THE COURT:  Very good.  Does anyone wish to be heard with respect to the debtor's motion for an order authorizing certain redactions?

(No verbal response)

THE COURT:  Okay.  I'm going to grant the motion. As Ms. Benedek noted this is relief that has been a relatively new trend, but I think it is responsive to new and unwelcomed trends in, frankly, the disclosure of personal information and the need to protect the privacy of individuals.  Again, I appreciate seeing the motion and particularly the references from my various colleagues in response to these issues.

I would ask to confirm because this has been, over the years, a matter of some concern to the Office of the

United States Trustee about striking an appropriate balance between the need for a public proceeding and the need to seal matters under Section 107.  At least from my prior experience, Ms. Casey, I assume that your office is comfortable with this form of order moving forward.

MS. CASEY:  Yes, Your Honor.  The debtor did reach out to us before filing the motion to find out what our comfort level is.  It does allow for the name to be disclosed, but not the address and that is what the U.S. Trustee does not object to at this time.

THE COURT:  Okay.  Anyone else wish to be heard?

(No verbal response)

THE COURT:  Very well.  Then I am going to grant the motion.  I do believe that it is appropriate and warranted.  Again, I think that these are very necessary considerations at the outset of a proceeding.  So I am happy to enter.  So the order will issue.

MS. BENEDEK:  Thank you, Your Honor.

THE COURT:  Ms. Benedek, do we have anything further this afternoon?

MS. BENEDEK:  I believe that covers every item on the agenda, but we do need to discuss the scheduling of a final hearing.

THE COURT:  Oh, yeah.  We do need a -- so we need a final hearing. Ms. Benedek or Mr. Horan, Mr. Wilkins, any -

- you haven't been in touch with Ms. Bello, have you?  I can give you a date if we need it.

MR. HORAN:  Your Honor, we have not been in touch with Ms. Bello about a second day hearing.

THE COURT:  Okay.  What are you thinking?  Today is the 22nd.

MR. HORAN:  Unless Mr. Wilkins disagrees I think the week of the 15th or really the week of the 22nd would be ideal.

THE COURT:  All right.  So the 15th is a Monday, I believe.  How about Thursday the 18th?

MR. HORAN:  That works for us, Your Honor.

THE COURT:  Let's do that at 11 a.m.

UNIDENTIFIED SPEAKER:  Very good, Your Honor.

THE COURT:  Let me make one observation.  I am going to presume that that hearing is via zoom, but if you wish I would be more than happy to accommodate a live hearing. I note that there is counsel and professionals that are from out of state.  This is a Sub V case and as in any case I'm cognizant of cost and burden on the parties, but, again, all I need is guidance from you folks on whether it will be live or zoom.

Obviously, you have got a number of folks that have already weighed in already and I want you to make sure that you keep them in the loop.  I am really, in that

respect, at your pleasure.

You can look to the local rules for objection deadlines.  You are welcome to use that date of the 18th for retentions and any other matters.  Again, I am not going to give you the speech I have given in the past.  Mr. Klauder has heard it, I think Mr. Horan has heard it before, this is postured as a Sub V case, I am a big fan of Sub V.  We have had a lot of success with it.

Mr. Scott raised issues about whether it is properly commenced and postured.  And if there are issues with that we will deal with it, but I certainly am familiar with Mr. Klauder as the Sub V Trustee.  The only observation I would make is what you already know that Sub V is intended and designed to move pretty quickly for purposes of reaching a reorganization plan and filing it within timelines that are not consistent with the typical 11.

I think we have been pretty committed to maintaining those timelines and actually look at that as one of the real benefits of the statutory structure.  So, again, I think I made kind of a flip comment that they're going to, I'm sure be a number of discussions on the various issues that have been raised today and that is fine.

If there are issues relating to discovery, exchange of information or the processing of the case or the need for a status conference you can expect that I am a

pretty open door in that respect and I believe, particularly in the context of -- I approach that in my 11's, but particularly in the context of a Sub V case I'm not looking to lose a collection of weeks with back and forth on motions and letters about what we are doing and how we're doing it. So, again, I am not cutting off anybody from those proceedings, but we are going to try to manage this pretty efficiently.

Before we conclude are there any other matters that we need to address?

MR. WILKINS:  No, Your Honor.  Thank you.

THE COURT:  Well, again, I very much appreciate everyone's time this morning. I hope you all have a nice weekend.  We will see you in a few weeks.

We are adjourned.  Thank you, counsel.

(Proceedings concluded at 12:20 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ Mary Zajaczkowski                    July 22, 2022

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                          July 22, 2022

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable