1          UNITED STATES BANKRUPTCY COURT
2               DISTRICT OF DELAWARE

                              .    Chapter 11
3   IN RE:                    .
                              .    Case No. 22-10635 (BLS)
4   ASTECH ENGINEERED PRODUCTS,   .
5   INC.,                     .
                              .    Courtroom No. 1
6                             .    824 North Market Street
                              .    Wilmington, Delaware 19801
7                             .
                  Debtors.    .    September 7, 2022
8   . . . . . . . . . . . . . . . .    1:42 p.m.

9                    TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE BRENDAN L. SHANNON
10              UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12
    For the Debtors:         Thomas Horan, Esquire
13                           COZEN O'CONNOR
                             1201 N. Market Street, Suite 1001
14                           Wilmington, Delaware 19801

15                           Matthew Wilkins, Esquire
                             BROOKS WILKINS SHARKEY& TURCO PLLC
16                           401 S Old Woodward Avenue
                             Suite 400
17                           Birmingham, Michigan 48009

18

19
    Audio Operator:          Dana L. Moore
20
    Transcription Company:   Reliable
21                           1007 N. Orange Street
                             Wilmington, Delaware 19801
22                           (302)654-8080
                             Email:  gmatthews@reliable-co.com
23

24  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

25

APPEARANCES (CONTINUED):

For Boeing:                Sean Scott, Esquire
                           Greg Deis, Esquire
                           MAYER BROWN LLP
                           71 South Wacker Drive
                           Chicago, Illinois 60606

                           Glenn Vanzura, Esquire
                           MAYER BROWN LLP
                           350 South Grand Avenue
                           Los Angeles, California 90071

1                                   INDEX

2  CONTESTED MOTION GOING FORWRAD:                        PAGE

3  Agenda
   Item 2:  Motion of the Debtor for Authority to Reject      4
4           Executory Contracts with the Boeing Company
             Pursuant to 11 U.S.C. §§ 105 and 365 and Rule
5            6006 of the Federal Rules of Bankruptcy
             Procedure [D.I. 99; Filed 8/17/22]
6

7           Court's Ruling:                                93

8

   WITNESSES CALLED
9  BY THE DEBTORS:                                        PAGE

10      DAVID RICHESON
        Direct examination by Mr. Wilkins                  13
11      Cross examination by Mr. Deis                      28

12      JOSHUA TEEPLE
        Direct examination by Mr. Wilkins                  62
13      Cross-examination by Mr. Vanzura                   69

14

15  Transcriptionists' Certificate                        98

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 1:42 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Please be seated.  I have a room full

4    of people.

5        (Laughter)

6                THE COURT:  I haven't seen this is forever.

7                Mr. Horan, good afternoon.  Good to see you.

8                MR. HORAN:  Good to see you, Your Honor.  Thomas

9    Horan from Cozen O'Connor for the debtor.

10               We are here today on one very contested matter.

11               THE COURT:  It seems to be.

12               MR. SCOTT:  That is the debtor's motion to reject

13   contracts with the Boeing Company.

14               THE COURT REPORTER:  Excuse me, Your Honor.  I'm

15   sorry.  You need to turn your camera on.

16               THE COURT:  Oh.

17               THE COURT REPORTER:  You have a room full of zoom

18   people.

19               THE COURT:  Terrific.  All right.  You may

20   proceed.

21               MR. HORAN:  There you are, right here.

22               THE COURT:  Fortunately, I'm not there.

23        (Laughter)

24               MR. HORAN:  Today's hearing -- I know Your Honor

25   has limited time today, but at today's hearing we are going

1   to present evidence from two witnesses, Dave Richeson and

2   Joshua Teeple.  I know that you have seen their declarations

3   and, as always, I know the Court has completely read up on

4   all this.

5           In connection with the motion, last Wednesday

6   night, we received document requests and a notice of

7   deposition for Mr. Richeson requested production of documents

8   by yesterday at noon.  The deposition was scheduled for 8:30

9   this morning.  I am happy to report that we met the deadline

10  for production of documents that Boeing set.  This morning we

11  had a deposition not only of Mr. Richeson, but also Mr.

12  Teeple.

13          So I think what we suggest, Your Honor, is that we

14  go straight into the evidence, especially considering Your

15  Honor's schedule today.  Then why don't we see where we are

16  unless you have other ideas.

17          THE COURT:  This is an unusual proceeding.  You

18  don't see this a lot.  I have a debtor's motion under Section

19  365 to reject a contract.  Rejection, as we know, is a Court

20  approved breach.  Consequences of that yield generally a

21  prepetition damages claim for rejection damages.  The

22  standard for consideration of a debtor's motion to assume or

23  to reject is business judgment.  Motions to assume are

24  typically accorded much more rigorous review because they

25  bind the estate to the contractual obligations, comunere,

1   good and bad.  Motions to reject are generally routine and as

2   counsel for Boeing noted in their papers, and they are

3   routine.

4          I am happy to hear testimony, but I think -- I'll

5   be honest, is that testimony going to indicate to me that for

6   every -- pardon my general usage, but for every widget that

7   is sold does the debtor lose money. If that is the case,

8   under the terms of this contract, that would seem to --

9          MS. CASEY:  Your Honor, I think you're still on

10  mute.

11         THE COURT:  Ms. Casey, this is Judge Shannon.  Are

12  you able to hear me?

13       (No verbal response)

14         THE COURT:  My mic is on.  Hang on just a second.

15         Ms. Casey, this is Judge Shannon.  Can you hear

16  me?

17         MS. CASEY:  I can hear you now, yes.  Thank you.

18         THE COURT:  Very good.  No problem.  Sorry for

19  that.

20         All right.  So back to the point, I am, again,

21  happy to listen to evidence and testimony, but I have a

22  debtor whose judgment I am accorded to show a measure of

23  deference who has identified a contract that it loses money

24  on substantially.  I am hard-pressed to see how I would deny

25  that motion absent substituting my judgment for the debtors.

1  I understand Boeing's point that there might be something

2  that could be done.  I am not sure that that is dispositive

3  of a request to reject the contract.

4          So I guess I am -- I would say the following: I

5  think I would like commentary, if I could, because I would

6  like to know what I am missing.  It would seem to me that

7  while I would be happy to entertain the testimony with all of

8  the stakeholders that are sitting here in area code 302 that

9  perhaps a better use of our time this afternoon might be to

10  have discussions that either have not occurred or have not

11  needed to have been occurred, but ought to happen soon.  If

12  there is no prospect for that I'm not telling anybody to tilt

13  at a windmill.

14          I think I would like to hear from Boeing.

15          MR. SCOTT:  Good afternoon, Your Honor.

16          THE COURT:  Welcome.

17          MR. SCOTT:  Sean Scott of Mayer Brown LLP on

18  behalf of the Boeing Company.

19          I am joined here in the Courtroom today by my

20  partners Greg Deis and Glenn Vanzura, as well as Mr. Bartley

21  from Young Conaway.

22          THE COURT:  Great.  Welcome, gentlemen.

23          MR. SCOTT:  Your Honor, we didn't raise the

24  objection lightly.  We are aware of the case law and we noted

25  it in our brief --

1        THE COURT:  Sure.

2        MR. SCOTT:  -- around the deference that is

3 typically granted to a debtor.  This is not a garden variety

4 rejection dispute.  And, in particular, I think, to Your

5 Honor's question I will take it head-on and I'm prepared to

6 present some more argument as to why you should hear the

7 evidence today.

8        To your specific question, Your Honor, the debtor

9 has testified, in evidence that we obtained this morning in

10 discovery, that the Boeing contracts are a contribution

11 margin positive.  What that means is that if the contracts

12 are rejected without further steps taken the other customers

13 will actually have to incur greater costs to support the

14 debtor.  The debtor's witness testified there are no

15 immediate steps to be taken post-rejection to alter the fixed

16 or variable costs of rejecting the Boeing contacts.

17        In essence, tomorrow, fi the debtor is losing

18 money on the Boeing contracts, which we think is actually

19 something that Your Honor should hear the evidence on because

20 even given deference to the business judgement, which we

21 think could be tested here, the evidence is paper thin as to

22 the losses.  We think that the evidence was results oriented.

23        Putting that aside, Your Honor, I think the key

24 point that we would make to you, and we think will come forth

25 in the evidence, is that the purpose of the rejection motion

1  is not only to breach the contracts -- I recognize, Your

2  Honor, that they could suspend performance today -- it is to

3  obtain concessions from other contract parties.  That was the

4  purpose of the filing.  You will find out that the declarant

5  actually admitted that that is the sole purpose of the

6  bankruptcy filing.

7          Your Honor, as we noted in our briefing, often

8  deference to a debtor's business judgment is proper.  I agree

9  with that wholeheartedly, but the case law also establishes

10 that one exception to that is when a rejection motion is

11 brought in bad faith.  Your Honor, I submit that listening to

12 the evidence today we have serious concerns about the good

13 faith of the debtor in bringing the motion to reject the

14 Boeing contracts.

15         Essentially, this case has been posited as a

16 binary outcome for the customers.  We are the first customer

17 who is at the edge of that spear.  It is either make

18 concessions at a profit margin for the debtor, whose

19 investors paid not a single dollar -- actually, I will

20 correct myself.  We learned they paid a single dollar, took

21 all the cash on the balance sheet, have done very little, if

22 anything, to rehabilitate this business, and now file

23 bankruptcy, increased the requested price concessions.

24         Your Honor, in that context we think and submit

25 that the rejection motion is using the bankruptcy as a sword

1  and not a shield. I know it is in a different context, but in

2  the world of SGL Carbon, Integrated Telecom there is case law

3  from the Third Circuit on down that while a debtor can use

4  the tools of bankruptcy it should not be doing so as a sword.

5          Here, I think you will hear from the testimony

6  that the only purpose for this bankruptcy was to extract

7  concessions from Boeing and the other customers.

8          THE COURT:  As I said, I'm happy to hear the

9  testimony.  I would just make the following observations:

10 debtors take risks all the time.  Sometimes they turn out

11 poorly.  Counterparties stand up and say you're really going

12 to regret this or debtors move to assume and tie themselves

13 to what turns out to be an anchor; so be it.  Debtors file

14 for bankruptcy relief often to obtain leverage and pressure

15 over institutional creditors over a particular supplier or

16 customer.

17         Again, if we look at some of the cases that talk

18 about bad faith filings, which I think is a really

19 fascinating area of the law, but most of them present a

20 somewhat different fact pattern or scenario where -- take SGL

21 Carbon, again, not my finest hour.  It wasn't --

22         MR. SCOTT:  I did not mean to bring it up, Your

23 Honor, but it is an important case of the Third Circuit.

24         THE COURT:  I'm over it.

25     (Laughter)

1          THE COURT:  You know, I have to say, since its

2  long, long removed when your client -- we were on the cusp of

3  confirmation and the Third Circuit dismissed the case, and

4  the client didn't mind.  That is probably not a good faith

5  filing.  So you had me there.

6          My point is this: those cases, SGL Carbon and the

7  lease cases -- I'm drawing a blank, but there are a bunch of

8  the lease cases for --

9          MR. SCOTT:  PPI.

10          THE COURT:  Yeah, PPI.

11          MR. SCOTT:  And I would be glad to examine that

12  because I think this case is closer to Integrated Telecom

13  which moved away from PPI for reasons I can explain.  I did

14  not mean to interrupt, Your Honor, but I --

15          THE COURT:  True, but those cases often

16  contemplate a debtor that is wildly solvent and profitable in

17  using the bankruptcy court -- the bankruptcy as, if not a

18  sword, perhaps even a blungant.

19          In this instance, again, I will take the

20  testimony, but the way it, at least, currently postured is

21  that the debtor is losing money and needs to right the ship,

22  develop -- fix its balance sheet and it has done so, you

23  know, with a risky play. It has filed for bankruptcy and it

24  is leaning hard on -- again, if I recall correctly from the

25  first day declaration the debtor has a handful of customers

 1  and it is leaning on them.  Debtors take risks and sometimes

 2  those have consequences.

 3        I would be prepared to hear the testimony.  Again,

 4  I leave it to you whether that is the best use of our time.

 5  I think that, again, I appreciate your candor and, again, I

 6  appreciate the quality of the submissions because this is an

 7  unusual request.  If there is not a productive use to having

 8  everyone in a single room and having a discussion then we

 9  should turn to witnesses.

10        MR. SCOTT:  Your Honor, I do think the evidence

11  would be helpful.  It is an interesting issue. I think we

12  spent several hours this morning examining the debtor's

13  witnesses.  And with the points you have made, you know, we

14  will be mindful of time.

15        THE COURT:  Okay.

16        MR. SCOTT:  The debtors can decide if we want to

17  pose submissions on the declarations, if they want to offer

18  direct if they think that is necessary. I do think some

19  limited cross-examination from my colleagues who are here to

20  handle that today will be productive not only for this

21  motion, but also for the trajectory of this case because it

22  will also inform Your Honor's views around the time table

23  that we're dealing with here.

24        THE COURT:  So noted.  All right, you may proceed.

25        MR. SCOTT:  Thank you, Your Honor.

1          MR. WILKINS:  Thank you, Judge Shannon.  Matthew

2   Wilkins, Brooks Wilkins Sharkey & Turco, on behalf of the

3   debtor.

4          I would call Dave Richeson to the stand.

5          THE COURT:  We will swear the witness, please.

6          DAVID PAUL RICHESON, DEBTOR WITNESS, SWORN

7          THE CLERK:  Please state and spell your name for

8   the record.

9          THE WITNESS:  David Paul Richeson, R-I-C-H-E-S-O-

10  N.

11          THE COURT:  Very good.  Have a seat.  Welcome.

12                      DIRECT EXAMINATION

13  BY MR. WILKINS:

14  Q    Mr. Richeson, good afternoon.

15       Can you describe your educational and professional

16  background?

17  A    Bachelor of Science degree from the University of

18  Kansas, 35 plus years --

19          THE COURT:  Can you get just a little bit closer

20  to the microphone. I can hear you fine. I just want to make

21  sure we pick you up for the transcript.

22          THE WITNESS:  Sure.  Bachelor of Science degree

23  from the University of Kansas, 35 plus years of manufacturing

24  management experience.

25  BY MR. WILKINS:

1  Q      Is a lot of that supply-chain?

2  A      Almost all of it is supply-chain.

3  Q      When did you first join ASTECH Engineered Products?

4  A      March 11th of this year.

5  Q      And in what capacity did you join the company?

6  A      As chairman.

7  Q      At what point did you become executive chairman?

8  A      Around the 1st of June.

9  Q      When did ASTECH acquire its business from GKN?

10 A      March 11th of 2022.

11 Q      Now after the acquisition, in the April, May timeframe,

12 did ASTECH conduct a review of its operations and the cost it

13 was incurring to make its products?

14 A      Yes.   ASTECH management conducted a review of the costs

15 of running its production and the profitability and loss of

16 the products that it was selling to the customers.

17 Q      In more detail, what was done in that regard?

18 A      We reviewed all of the cost structure for doing

19 business with all of the customers on a part by part basis

20 and determined that some customers had profitable business

21 and other customers had business that was performing at a

22 significant loss.

23 Q      And in that timeframe -- and this is April, May of

24 2022, Your Honor -- did you communicate your findings with

25 the Boeing Company?

1  A     Yes.  Those findings were communicated with the Boeing

2  Company both in writing and in a meeting in Everett,

3  Washington in May.

4  Q     What happened at that meeting?

5  A     At that meeting Boeing was insistent that ASTECH

6  restart production and then insisted that there would be no

7  discussions relative to price until ASTECH was on time for a

8  minimum of 90 days.  At that point in time they would engage

9  in a discussion that ASTECH would not like.

10 Q     You, yourself, did not make the decision to stop

11 production?

12 A     That's correct.  The former CEO made that decision.

13 Q     Who was that person?

14 A     Jack Esterhay.

15 Q     So would you characterize the meeting in Washington as

16 remotely positive?

17 A     No.  I would classify the meeting as contentious and

18 not a positive use of anybody's time.

19 Q     Did you leave with the impression that Boeing was

20 willing to engage with ASTECH at that time on discussions

21 concerning the pricing of its contracts with ASTECH?

22 A     Boeing made it clear that they were not willing to

23 engage in pricing on the contracts and that once a certain

24 set of circumstances were met that Boeing would engage in a

25 conversation that ASTECH would not like.

1  Q      Who was on your ASTECH senior management team at

2  present?

3  A      At present I serve as executive chairman.  A gentleman

4  by the name of Ed Bidanset serves as the interim chief

5  operating officer.  A gentleman by the name of Madison Adams

6  serves as the chief financial officer.  And a gentleman by

7  the name of Jared Bede serves as general counsel.

8  Q      Is it Beed, B-E-D-E?

9  A      B-E-D-E.

10  Q      And that has been ASTECH's core senior management team

11  to the present time, is that correct?

12  A      That is correct.

13  Q      Did the costing and pricing work initially done in the

14  April, May timeframe show that ASTECH would eventually run

15  out of money if nothing changed with the contracts?

16  A      Yes.

17  Q      Was a cash-flow projection prepared in that timeframe

18  which showed that?

19  A      Yes.  Cash-flow projections were prepared that went

20  through the end of 2022 that showed that ASTECH would run out

21  of cash.

22  Q      Did you and senior management discuss that cash-flow

23  situation?

24  A      Yes.  All members of the senior management team and I

25  discussed the cash-flow projections.

1  Q     What did your senior management team decide to do next

2  with respect to the customers?

3  A     The management team decided that the best course of

4  action was to ask the customers to join us in Detroit at The

5  Weston, at the airport, for a meeting to discuss potential

6  price increases with the customers in order to make the

7  business profitable and cash-flow positive going forward or

8  to engage in conversations with us to find new sources for

9  them to provide, or to obtain their products, or to discuss

10  the possibility of a sale to some other party.

11          THE COURT:  Mr. Richeson, I apologize, but when

12  was the -- I just want to make sure I understand the

13  timeline.  What is the time for that proposed meeting in

14  Detroit?

15          THE WITNESS:  The meeting was held on June 20th.

16          THE COURT:  Okay.

17          MR. WILKINS:  I was going to ask him that?

18          THE COURT:  Oh, okay.

19  BY MR. WILKINS:

20  Q     The meeting was held?

21  A     The meeting was held on June 20th.

22  Q     Did the four key customers, did they send business

23  representatives?

24  A     Three of the four customers sent business

25  representatives to the meeting.  The Boeing Company only sent

1 | a restructuring advisor and attorneys to the meeting.

2 | Q     What did ASTECH hope would come out of that meeting in

3 | Detroit on June 20th?

4 | A     We had hoped for an agreement to have continuing

5 | discussions so that we could find a path forward either

6 | through the pricing or through the movement of products to

7 | other suppliers with our help and support or identify a

8 | possible sale.

9 | Q     You needed price increases to survive?

10 | A     That is correct.  If we didn't get price increases we

11 | were going to run out of cash.

12 | Q     In your view, during the ensuing several weeks after

13 | the June 20th meeting did any of the customers do much in the

14 | way of engaging with ASTECH along the lines that you just

15 | said?

16 | A     Two of the customers engaged significantly.  Two of

17 | them agreed to work with us and we had a number of telephone

18 | calls going forward.

19 | Q     Was Boeing one of those customers?

20 | A     Boeing was not.

21 | Q     Did ASTECH project or expect its financial condition to

22 | improve in some respects after the Detroit meeting?

23 | A     We were hopeful that we would be able to work out

24 | pricing with customers and get an improved situation.  We

25 | worked on reducing scrap in the operations of the facility.

1   And we were working on increasing production to meet customer

2   requirements. Those were the focuses of the June -- after the

3   June meeting.

4   Q      Did you expect any meaningful improvement absent

5   customer price increases?

6   A      Not to the point where we would get the business to be

7   cash-flow positive.

8   Q      When little or no progress was made after the June 20th

9   meeting did the ASTECH senior management team begin to talk

10  about bankruptcy options?

11  A      Yes.  Eventually the management team began to discuss

12  bankruptcy options when we couldn't see a path forward

13  without more customer engagement.

14  Q      That wasn't your preferred choice, was it?

15  A      No. That is absolutely not our preferred choice.

16  Q      You prefer to work with the customers?

17  A      We preferred to work with the customers to find a

18  solution.  Again, that solution could have been price

19  increases, it could have been movement of product to other

20  suppliers or it could have been the sale of the business.

21  Any of those three options were clearly put on the table.

22  Q      None of that happened?

23  A      None of that happened.

24  Q      And the company was continuing to lose money?

25  A      Yes.  The company continued to lose money.

1  Q     Ultimately was the decision made to file bankruptcy?

2  A     Yes.  Ultimately we did come to the conclusion that the

3  decision -- that the best decision to move forward with was

4  to file for bankruptcy.

5  Q     And was that decision a product of discussions with

6  your entire senior management team and outside counsel?

7  A     Yes, it was, the entire management team and outside

8  counsel that we came to that conclusion.

9  Q     And the case was filed July 15th?

10  A     That is correct.

11  Q     So immediately after the case was filed did you

12  personally reach out to your four largest customers?

13  A     Yes.  I personally called all four of the largest

14  customers to speak with them to explain what we had done and

15  what we were trying to accomplish.  I reached a number of

16  those that I did not reach.  I also sent emails too, to make

17  sure that they had some personal contact from me as part of

18  the process in trying to move forward.

19  Q     Did you try to reach out to Boeing?

20  A     I did.  I reached out to Barbara Zetterberg at Boeing

21  both via telephone and via email.  She didn't respond either

22  to the telephone call or to the email, but eventually did

23  send a text message that said that she was aware that we had

24  filed for Chapter 11.

25  Q     That was Barbara Zetterberg?

1   A      Yes, that's correct.

2   Q      Do you know what her position is at Boeing?

3   A      I don't recall the position title.

4   Q      Would you characterize her role as, sort of, your

5   contact at the company?

6   A      She was -- she told us that she was our primary contact

7   with Boeing.

8   Q      During the first few weeks after the bankruptcy was

9   filed on July 15th did anyone from Boeing contact you or the

10  senior management team to have -- or started dialog in the

11  pricing of the Boeing contracts with ASTECH?

12  A      No.  There was no outreach to discuss the pricing.

13  There was an outreach via email to request a significant

14  amount of document production.

15  Q      Other customers responded differently to the

16  bankruptcy, did they not?

17  A      Yes.  We engaged in conversations with the other

18  customers regarding the situation and possible price

19  increases.

20  Q      Did several customers agree to accelerate their payment

21  terms to ASTECH?

22  A      Yes.  Two of the customers, ITP and Spirit, agreed to

23  go to, in essence, net one payment terms which has provided a

24  significant amount of liquidity for the company that Boeing

25  has benefited from because they refused to participate in

1  that.

2  Q      And that helped ASTECH's near term cash-flow?

3  A      It has helped cash-flow tremendously.  It has helped us

4  increase our production.  August was the highest level of

5  production and shipments that it had since ownership changed

6  in Marcy.

7  Q      Did Boeing do anything to change its terms or,

8  otherwise, offer any assistance after the bankruptcy was

9  filed?

10 An     In one conversation that I had with Barbara Zetterberg

11 at one point she said that they would decline to consider

12 improving payment terms as she didn't think it was

13 significant and needed.

14 Q      But you have four jobs with Boeing, is that right?

15 A      Four part numbers, that's correct.

16 Q      Four part numbers.  Thank you.

17        Two of them are marginally profitable, correct?

18 A      That is correct.

19 Q      Two of them are not profitable?

20 A      That is correct.

21 Q      And one, call it the "kit," is highly unprofitable,

22 isn't that correct?

23 A      Highly unprofitable, yes.

24 Q      What is the sales price?

25 A      Approximately $89,000 for the kit.

1   Q     What does ASTECH estimate its costing ASTECH for every

2   one of the kits that gets made?

3   A     In excess of $200,000.

4   Q     Now you testified that you had socialized this need for

5   price increases with Boeing in April and May, you testified

6   that you invited them to a meeting and they attended in June.

7   Did ASTECH's senior management decide to engage an outside

8   financial consultant to continue to refine its costing and

9   pricing data?

10  A     Yes.  The management team discussed the need to bring-

11  in a third-party financial consultant to evaluate the cost

12  structure of the business and to provide an independent view

13  of what the pricing might need to look like in order to have

14  a successful outcome.

15  Q     Did you hire an outside financial advisor?

16  A     Yes, we did.  We hired Grobstein Teeple in California.

17  Q     And why were they hired?

18  A     They were hired for a number of reasons.  First, they

19  were local to the California market.  Second, they have

20  significant bankruptcy and restructuring.  Third, they were

21  available.

22  Q     What was your initial assignment to them?  What did you

23  ask them to do?

24  A      ASTECH asked them to get a hold of the cost

25  information for the company and to assemble it on a part by

1  part basis.  And using a forecast through the end of 2023

2  establish pricing that would be needed for the company to be

3  successful using a 9.4 EBITDA margin as the target for the

4  company based on market research from TSI market in terms of

5  the aerospace and defense industry.

6  Q    Who was the lead from Grobstein Teeple on that

7  engagement?

8  A    Joshua Teeple.

9  Q    Did they do the work that you asked them to do?

10  A    Absolutely.  They did the work very well, very fast.

11  Q    When did ASTECH's senior management team, including

12  yourself, get the, sort of, first cuts or first drafts of the

13  Grobstein Teeple?

14  A    Within a week of when we requested that Josh begin work

15  on the product.

16  Q    Would that have been sometime in early August?

17  A    I think that is correct.

18  Q    During the first week of August did ASTECH, again,

19  reach out to its four larger customers to setup one on one

20  meetings to discuss the Grobstein Teeple gross margin

21  analysis?

22  A    Yes.  We reached out to all four customers requesting

23  one on one meetings so that we could review the results of

24  the work that had been done and the results of the projected

25  price increases that we would be asking for.  Three of the

1  four customers scheduled meetings relatively quickly.  Boeing

2  was the last and scheduled a date that was the farthest out.

3  Q     During ASTECH's one on one meetings or meetings with

4  each individual customer, I should say, did Josh Teeple at

5  Grobstein Teeple walk the customers through the analysis that

6  he had done?

7  A     Yes.  Josh ran the screens.  There were teams meetings.

8  He pulled up the spreadsheet document that was created and

9  walked the customers through all of the rational and the

10  methods for obtaining the costs and then the projected price

11  increases, again, based on that target EBITDA margin.

12  Q     Did the company offer and encourage each customer to

13  reach out directly to Mr. Teeple if they had any questions,

14  comments or input on the analysis?

15  A     Yes.  We offered for them to independently reach out to

16  Joshua Teeple and ask anything that they wanted to about the

17  way that the model had been created and constructed.

18  Q     Now do you know about how many of the Boeing kits are

19  scheduled for production between now and the end of 2023?

20  A     I do.  Its approximately 47 kits.

21  Q     Those kits are fairly labor intensive?

22  A     There's about 600 hours of labor associated with each

23  kit.

24  Q     Again, you testified earlier that the kits can only be

25  sold for $90,000 at present, correct?

1  A      That is correct.

2  Q      And it cost the company over $200,000?

3  A      Yes, that is correct.

4  Q      Would you say that the work that your senior management

5  team had done initially in the April, May timeframe and then

6  prior to the June 20th meeting was confirmed by the Grobstein

7  Teeple gross margin analysis?

8  A      If anything Joshua Teeple's work confirmed that our

9  initial thought was actually a little bit lower then what it

10 probably needed to be in order to obtain those margins.

11 Q      It was worse than you thought?

12 A      It was worse than we thought.

13 Q      Now based upon all that work and analysis, from the

14 time ASTECH took control of the business, did ASTECH's senior

15 management team determine, in the exercise of its judgment,

16 that the best thing for ASTECH was to seek to reject the

17 Boeing contracts?

18 A      Yes, because there was no engagement with Boeing in

19 terms of any fruitful conversations, there were no questions

20 going back, we felt that the best path forward to try and

21 resolve the matter was to reject the contract.

22 Q      The Company was losing money like crazy on that?

23 A      The Company lost approximately $950,000 in the six

24 weeks after filing bankruptcy just on the Boeing product.

25 Q      The motion to file the Boeing -- I'm sorry, the motion

1 to reject the Boeing contract was filed August 17th.  Does

2 that sound familiar?

3 A    That is correct.

4 Q    Since the bankruptcy was filed has the company

5 continued to make parts for Boeing?

6 A    Yes.

7 Q    I think you said a minute ago that the losses that you

8 calculated that had been incurred on the Boeing work is for

9 six weeks of the case $954,000?

10 A    Yes, sir.  That is correct.

11 Q    Is there any reason to believe that those losses will

12 not continue if the contracts are not rejected?

13 A    The losses will continue.

14 Q    In your view does continuing to have to manufacture and

15 sell the parts to Boeing under the contracts ASTECH has pose

16 a threat to ASTECH's ability to survive?

17 A    Yes.  It does because we will continue to have negative

18 cash-flow on that product and it will strip the cash that is

19 available for the company to support the rest of the

20 business.

21 Q    In your view, in consultation with your senior

22 management team, can ASTECH survive without the Boeing work?

23 A    Yes.  ASTECH can survive without the Boeing work.

24 Although the, as was pointed out in an initial statement by

25 the opposing counsel, product may be slightly contribution

1  margin profitable that doesn't consider anything in terms of

2  overhead.  That only considers labor and material.

3  Q     In consultation, again, with your senior management

4  team is it your view that the rejection of the Boeing

5  contracts is in the best interest of the ASTECH bankruptcy

6  estate?

7  A     Yes.  The management team and I continue to believe

8  that the rejection of the contract is the best path forward

9  at this time.

10  Q     Why is that?

11  A     Because it will allow us to focus our very limited

12  resources on working with the remaining customers in order to

13  be able to deliver product to them that ultimately could

14  result in improved contracts and improved pricing on the

15  remaining products.

16            MR. WILKINS:  That is all I have for Mr. Richeson.

17            THE COURT:  Cross?

18            MR. DEIS:  May I proceed, Your Honor?

19            THE COURT:  Of course.  Welcome.

20            MR. DEIS:  Thank you.  Greg Deis on behalf of

21  Boeing.  Thank you, Judge.

22            THE COURT:  Sure.

23                      CROSS-EXAMINATION

24  BY MR. DEIS:

25  Q     Mr. Richeson, today ASTECH is balance sheet solvent,

1  correct?

2  A      Yes.

3  Q      Setting overhead costs to the side the Boeing

4  contracts, I think as you mentioned, are contribution margin

5  positive, correct?

6  A      Slightly.

7  Q      If the Court grants the rejection motion there is no

8  immediate concrete steps planned to reduce ASTECH's overhead,

9  correct?

10  A      Not immediately.  There isn't a need to.

11  Q      The Grobstein analysis -- and can I refer to that as GT

12  and you will understand who I am referring to, Grobstein

13  Temple?

14  A      Yes, Teeple.

15  Q      Teeple.  I apologize.

16         That analysis looked at only overhead for a three month

17  period, correct?

18  A      That is correct.

19  Q      That was -- it didn't have much longer because you

20  hadn't owned the company much longer, correct?

21  A      That is correct.

22  Q      And then that amount was projected over the remainder

23  of the year 2022, right?

24  A      Yes.

25  Q      You didn't look at whether overhead fluctuated during

1  2021, for example, did you?

2  A      Did not.

3  Q      And you didn't look at whether it would be anticipated

4  that overhead might be reduced during the remainder of the

5  year.  You simply took that three month period and projected

6  it out, right?

7  A      That is correct.

8  Q      Now pre-acquisition, prior to the time Ten Oaks took

9  over, there was an analysis of ASTECH that showed that the

10  company could be cash-flow positive by the end of 2022,

11  correct?

12  A      There was something that I have not seen, but I believe

13  that that was produced.

14  Q      You have never seen that, right?

15  A      I have not seen the detail behind it.  That is correct.

16  Q      Nor has Mr. Teeple seen it, correct?

17  A      That is correct.

18  Q      Because it wasn't provided to him, right?

19  A      That's correct.

20  Q      Now you asked GT to conduct its analysis with the

21  target of 9.4 percent EBITDA, right?

22  A      Correct.

23  Q      Now you, yourself, have no aviation experience prior to

24  coming to ASTECH, fair?

25  A      Minor experience.

1  Q      And you got that number from CSI manual?  Can you
2  explain what that is?
3  A      CSIMarket.
4  Q      All right.
5  A      It's an online service that analyzes the financial
6  results of publicly traded companies.
7  Q      So what you did, in terms of your discussions on price
8  increases, was you started with this assumption of 9.4
9  percent EBITDA and you made demands with the target towards a
10 particular percentage EBITDA number, is that right?
11 A      Not demands, requests.
12 Q      And that number has fluctuated during these
13 negotiations that you were explaining to the Judge, hasn't
14 it?
15 A      There have been discussions that had a range.
16 Q      At some point in time you tried to request price
17 increases that would had resulted in 12 percent EBITDA,
18 right?
19 A      No, sir.  We never made requests for price increases of
20 12 percent. We had some discussions.
21 Q      Internal discussions?
22 A      Internal discussions.
23 Q      On the other end there were internal discussions about
24 whether a 7 percent EBITDA number might be the appropriate
25 target in terms of the price increases to request, correct?

1  A      That is correct.

2  Q      And there were also internal discussions --

3              THE COURT:  Hang on.  Mr. Deis?

4              MR. DEIS:  Yes.

5              THE COURT:  I just want to sure -- I think I

6  understand the role of the GT analysis here in terms of the

7  process you are describing, but if you don't mind I would

8  like you to clarify it for me.  And you may do that through

9  the witness, but it would maybe just be easier for you to

10  answer my question.

11             MR. DEIS:  Sure.

12             THE COURT:  So the witness testified that they

13  brought GT in to do, basically, a bottom-up review and look

14  at their product lines and determine whether they were making

15  money or losing money.  The witness testified that exercise

16  occurred.  And at the conclusion of that exercise, I think

17  his testimony was, actually they demonstrated that things

18  were worse than the management team had originally

19  identified.  That is his testimony.  Obviously, you contest

20  that.

21             We didn't discuss the EBITDA function and so I'm

22  just going to ask: is the -- was GT asked to model what sort

23  of demands you should make -- the company should make of its

24  customers in order to hit a particular projected EBITDA

25  number and then you would back into the pricing request from

1 that.  Is that what we are doing?

2         MR. DEIS:  That is my understanding.  Your Honor,

3 I would defer to the witness.  We only had four hours with

4 him this morning.

5         THE COURT:  That's fine.  Again, I will defer to

6 the witness.  I just wanted to make sure.

7         So, again, Mr. Richeson, I will ask you: you have

8 heard my description, but the idea would be that you had this

9 discussion with GT who looked at you pricing model and said

10 you're deep under water and its worse than you think.  Then

11 you said give us the pricing model that would make us EBITDA

12 positive at either, and I would expect, if I'm right, you

13 were asked -- they were asked to model and run 5, 7.5, 9

14 percent, 12 percent, 15, whatever numbers and then you would

15 have, at least, that information that would say if we can get

16 these guys to move from a dollar to a dollar seventy-five

17 that would bring us to 5 percent and that might not be it.

18         So that is the thought process.  I am trying to

19 figure this out.

20         MR. DEIS:  Let me see if I can flesh it out with

21 questions, Judge.

22         THE COURT:  Sure.

23         THE WITNESS:  Can I answer, Your Honor, first?

24         THE COURT:  Yes.

25         THE WITNESS:  In essence that is the way we

1  modeled it out.  We asked him to come together with all of

2  the costs, to model the costs into the system, then to come

3  to a conclusion about what pricing would need to look like to

4  achieve a 9.4 percent EBITDA margin which was the industry

5  average for aerospace and defense.  Then let the customers

6  know, and also going all the way back to the meeting in

7  Detroit in June that once we achieved an agreed upon margin

8  that anything beyond that we would share in terms of price

9  reductions going forward and savings.

10             So it wasn't a one-stop hit a wall and then

11 maintain.  It was really a collaboration effort to try and

12 work with the customers to get to a profitable go-forward

13 position that made sense for everybody involved so that we

14 could meet all of the needs of all of the constituencies.

15             THE COURT:  All right.  Thank you for responding

16 to my question.

17             Mr. Deis, you're welcome to explore this further.

18 I just had not seen this model and I hadn't seen the report.

19 I don't think it's in the materials and that's fine, but I

20 just wanted to make sure that my perception of it was

21 consistent with -- I mean I was guessing a little bit, but I

22 think I understand it.  Again, you're welcome to conduct the

23 examination.

24             MR. DEIS:  I may just ask a few clarifying

25 questions because I think Your Honor might have a

1  misunderstanding based on your last answer.

2  BY MR. DEIS:

3  Q     There wasn't an analysis by GT at 9.4 versus 7 versus

4  5.  You gave them the 9.4 and that is what they modeled,

5  correct?

6  A     That's correct.  I didn't interpret what Your Honor had

7  asked as meaning that.  I think he was, in my interpretation,

8  giving examples of different price points and I identified

9  that 9.4 was what we used.

10 Q     And Mr. Teeple will testify here and he will be

11 questioned by the lawyers, but Mr. Teeple never looked at

12 whether, for example, 6 percent EBITDA might be cash-flow

13 positive, correct?

14 A     Correct.

15 Q     He didn't look at whether that might, in fact, be

16 profitable, did he?

17 A     That was not the ask.

18 Q     He was asked one specific question which is what is the

19 price increase we would need to impose to get to 9.4 percent?

20 A     The question was, was the product losing money and then

21 if the product is losing money what prices would need to be

22 obtained to achieve a 9.4 percent EBITDA margin for the

23 business.

24 Q     Now in your discussions with the customers internal you

25 talked about the fact that a price increase associated with

1  anything north of 7 percent EBITDA might be viewed as

2  excessive, correct?

3  A    There was an email to that effect that we discussed

4  this morning.

5  Q    In fact, you used the Ohio, or Kansas, or whatever term

6  you want to use that "pigs get fat, hogs get slaughtered,"

7  right?

8  A    Yes, sir.

9         THE COURT:  I think that's a bankruptcy term.

10       (Laughter)

11        MR. DEIS:  Maybe I'm more bankruptcy then I think.

12       (Laughter)

13  BY MR. DEIS:

14  Q    We went back to -- so there had been an analysis by Ten

15  Oaks that the company could be cash-flow positive prior to

16  the end of 2022.  Do you recall that?

17  A    I do.

18  Q    That analysis you never looked at?

19  A    Correct.

20  Q    ASTECH had experienced 6 percent EBITDA in 2021,

21  correct?

22  A    I don't know that.

23  Q    You have seen documents to that effect, though,

24  correct?

25  A    I don't know that I have seen documents to that effect.

1  Did we review those this morning because I don't recall

2  seeing a document that said that?

3  Q    I think we did, but we can show them to you in a

4  moment.

5       You don't know whether 6 percent EBITDA, again, would

6  be cash-flow positive, correct?

7  A    I can't sit here today and answer that.

8  Q    Or whether it might even be profitable, right?

9  A    Again, I can't sit here at this moment today and answer

10 that.

11 Q    Now there were also internal discussions that a 6

12 percent EBITDA figure would result in a $20 million valuation

13 for the company, do you recall that?

14 A    I do.

15 Q    And you testified this morning that the investment

16 horizon of Ten Oaks was on the shorter side, right?

17 A    Correct.

18 Q    All right.  You couldn't specify a number, but you

19 acknowledged that there were discussions about it being on

20 what you said, I think, was the shorter side of things,

21 correct?

22 A    Yes.

23 Q    All right.  The 9.4 percent EBITDA target that you

24 asked GT to use that would result in a valuation north of $20

25 million, correct?

1   A      That is your assumption.  I can't say that.

2   Q      Well that certainly makes sense, doesn't it?

3   A      Again, I can't answer that.  It's a complex world in

4   terms of M&A.

5   Q      And if we go back, again, Ten Oaks, I think you called

6   it a "pay or take" scenario was the terms of the transaction?

7   A      No, pay to take.

8   Q      Pay to take.  And what you meant by that was no cash

9   out of pocket by Ten Oaks and they took the $6.7 cash that

10  remained on the books of ASTECH.  Is that fair?

11  A      I believe, to be accurate, Ten Oaks or the transaction

12  occurred for $1.

13  Q      Now ASTECH is 100 percent owned by ASTECH Holdings,

14  LLC, correct?

15  A      Correct.

16  Q      That is a holding company between Ten Oaks and ASTECH,

17  is that right?

18  A      I don't believe that's correct.

19  Q      You don't believe that's correct?

20  A      No, I don't believe --

21  Q      What's your understanding?

22  A      I don't believe Ten Oaks is actually an owner of

23  anything.  Ten Oaks is a management company.

24  Q      Ten Oaks Management, LLC is the manager of ASTECH

25  Holdings, LLC; correct?

1  A      Correct.

2  Q      And you have a five percent interest in ASTECH

3  Holdings; right?

4  A      Correct.

5  Q      That's part of your remuneration for your services as

6  executive chairman; is that correct?

7  A      Yes.

8  Q      So, at a $20 million sale, you would be entitled,

9  gross, $1 million; is that right?

10 A      I think we discussed that this morning, that's

11 approximately correct.

12 Q      Let me show you what we'll mark as Exhibit 1.

13              MR. DEIS:  Should we -- is that fine, Your Honor?

14              THE COURT:  Sure.

15              MR. DEIS:  Which is Tab 14.

16       (Pause)

17              MR. DEIS:  May I approach, Judge?

18              THE COURT:  Of course.

19              THE WITNESS:  Thank you.

20              THE COURT:  Thanks.

21 BY MR. DEIS:

22 Q      And, for the record, Exhibit 1 is a document beginning

23 at Bates Debtor 000701.

24       We talked about this document this morning, Mr.

25 Richardson?

1  A    Yes, although it seems to be missing a portion of the

2  document now.

3  Q    Which portion is missing?

4  A    The portion that involved the attorneys.

5  Q    I think you're remembering a different document.

6  A    Perhaps, but I thought that this document included

7  that, but okay.

8  Q    So if we focus on the page Bates stamped 702, do you

9  see that?

10 A    Yes, sir.

11 Q    At the bottom, Mr. Lovrovich responds to an email chain

12 that begins with you on 7/03 regarding the target EBITDA

13 average to use in terms of price increases to request from

14 customers, at a high level; is that fair?

15 A    Yes.

16 Q    And Mr. Lovrovich, just for the Court's benefit, is

17 who?

18 A    He's the partner for separation and value creation at

19 Ten Oaks.

20 Q    All right.  And in Mr. Lovrovich's email he says, "I

21 think it's reasonable to ask for 12, expecting them to knock

22 down to below ten, but I also think that there is margin to

23 gain from efficiencies."  Do you see that?

24 A    I do.

25 Q    All right.  And that reference to margin to gain from

1  efficiencies would be things like productivity increases;

2  correct?

3  A    I think that's fair.

4  Q    Decreasing, reducing the scrap rate for the company;

5  right?

6  A    That is one piece, yes.

7  Q    All right.  And those efficiencies, at this point the

8  company hasn't conducted any analysis as to how, for example,

9  reducing the scrap rate might contribute to increased EBITDA;

10 right?

11 A    Correct.

12 Q    The company has conducted no analysis as to how

13 reducing overhead costs might contribute to increased EBITDA;

14 correct?

15 A    That is correct.

16 Q    The company hasn't looked at how productivity increases

17 and gained efficiencies as a result might contribute to

18 increased EBITDA; right?

19 a    That's correct.

20 Q    The only thing that the company is focused on to this

21 point has been how price increases would contribute to that

22 result; is that fair?

23 A    No, that's not fair.

24 Q    Well, you just testified that no such analysis exists

25 for overhead, for scrap reduction, or for reduced overhead;

1  correct?

2  A    I don't have to know -- or I don't have to do an

3  analysis to know that if I reduce the scrap rate that it's

4  going to improve EBITDA.

5  Q    Understood, but you don't know whether those steps,

6  taken in conjunction with others, might get you to get the

7  9.4 as opposed to simply focusing on price increases;

8  correct?

9  A    There's not enough scrap generated in the building to

10  get to 9.4.

11  Q    You've conducted an analysis to substantiate that

12  opinion?

13  A    Yes.

14  Q    Who conducted that analysis?

15  A    I don't recall the name of the individual, but it was

16  done through the accounting office.

17  Q    The -- and, again, that 9.4 number is the number you

18  selected based on this manual, right, the CSI manual?

19  A    Online CSI data.

20  Q    All right.  Because you yourself don't have any

21  aviation expertise; correct?

22  A    Correct.

23  Q    And, again, that 9.4 number is well in excess of the

24  seven percent number that you had identified as a threshold

25  beyond which a price increase might be considered excessive,

1  in or around this time of June 2022; correct?

2  A    I would classify it as being slightly greater than.

3  Q    Nevertheless, in internal communications, you

4  identified seven percent as a threshold beyond which a price

5  increase targeted to a percentage EBITDA beyond that would be

6  considered excessive; right?

7  A    No, I didn't say it would be considered excessive; I

8  don't think there's any document that says that.

9  Q    Well, you said that it could be viewed as excessive,

10 and then you used the hog and the pig analogy; did you not?

11 A    So, without the document in front of me, I think it's

12 difficult to exactly examine what the word said and how it

13 would be interpreted.

14         MR. DEIS:  Well, the document has been clawed back

15 based on privilege.  If Your Honor would like to see it, we

16 can certainly show it to him.

17         THE COURT:  No, I don't think that that's

18 necessary.

19         MR. DEIS:  All right.

20         THE COURT:  I understand the point that's made and

21 --

22         MR. DEIS:  All right.  Thank you, Judge.

23         THE COURT:  Yeah.

24 BY MR. DEIS:

25 Q    So the next sentence says, if we get to six percent,

1  which was last year's, that would get us to two million in

2  EBITDA on 35 million in revenue, plus some efficiency gains,

3  is a roadmap to $20 million exit; right?  Do you see that?

4  A     I do.

5  Q     All right.  And that reference to a $20 million exit is

6  a reference to the price at which Ten Oaks could exit -- sell

7  the business; right?

8  A     That $20 million exit references a price that could be

9  achieved possibly.

10  Q     Under the shorter-duration horizon that you had talked

11  about a moment ago; right?

12  A     I don't think there's any mention of horizon, time

13  horizon in there.

14  Q     The -- now, we talked about how there were certain

15  analyses that had been done prior to the acquisition and,

16  again, an analysis had been done that the company could be

17  cash flow-positive by the end of the year.  You can't speak

18  to that because you never looked at it; right?

19  A     Correct.

20  Q     There's other things that have changed prior to the

21  acquisition as to now; is that fair?

22  A     I don't know.

23  Q     Well, in terms of, prior to the acquisition, ASTECH --

24  strike that -- GKN and Ten Oaks had to get the consent of

25  Boeing in order to consummate the acquisition that ultimately

1  happened in March 2022; correct?

2  A     Yes.

3  Q     All right.  And, as part of that, there were a number

4  of discussions that involved Ten Oaks and Boeing; right?

5  A     Yes.

6  Q     Written and in-person meetings; right?

7  A     I believe so.

8  Q     All right.  And, in those meetings, Boeing asked

9  questions about what's the go-forward plan for this company

10 after the acquisition; right?

11 A     I didn't participate, so I don't know.

12 Q     You -- well, let's show you one document that I know

13 you said this morning you had seen.

14        (Pause)

15            MR. DEIS:  May I approach, Judge?

16            THE COURT:  Sure.

17            MR. DEIS:  I'm showing you what's been marked as

18 Exhibit 2, which is a presentation -- I'm going to represent

19 to Your Honor -- that was made in or around February of 2022.

20            THE COURT:  Okay, thank you.  Hang on, I just want

21 to be clear.  I keep hearing somebody's phone ping.  It has

22 been two and a half years since I've confiscated one.

23        (Laughter)

24            THE COURT:  So, if someone wants to take that one

25 for the team, go ahead, but we're all figuring this out.

1        Mr. Deis, you may proceed.

2        MR. DEIS:  Thank you, Judge.

3   BY MR. DEIS:

4   Q    This is a presentation that Ten Oaks gave to Boeing in

5   -- sometime prior to the acquisition in February of 2022;

6   correct?

7   A    That is correct.

8   Q    All right.  And you've seen this document before,

9   although you weren't present at the time the presentation was

10  made; do I recall that correctly?

11  A    So I believe I was present when this document was

12  exchanged with Boeing in February of '22.

13  Q    Okay.  And, if we look at page 7 of the document, it's

14  titled "ASTECH Value Thesis," do you see that?

15  A    I'm getting there.  I'm there.

16  Q    All right.  And if we look at the first section of the

17  document, the top section, and there's a number of sub-

18  bullets there, the third one reads, "Improvement hypothesis

19  is straightforward given the under-investment and under-

20  management of the business unit."  Do you see that?

21  A    I do.

22  Q    And that's what Ten Oaks represented to Boeing in or

23  around February 2022 as part of its attempt to get Boeing's

24  consent for the assignment of the contract; correct?

25  A    This was the document that was presented in the

1  meeting.

2  Q    And you testified today that, on behalf of ASTECH, you

3  don't have an opinion as to whether under-investment is an

4  issue facing ASTECH; right?

5  A    That's correct.

6  Q    Nor have you formed a view on whether under-management

7  is an issue that faces ASTECH; correct?

8  A    That's correct.

9  Q    So Ten Oaks had these views ahead of time and ASTECH

10  has done nothing to analyze whether or not those are in fact

11  the case; correct?

12  A    Correct.

13  Q    There was also a discussion, if we turn to page 10, of

14  specific capex improvements and 2022 Boeing impacts that

15  could be anticipated under a Ten Oaks regime; do you see

16  that?

17  A    I do.

18  Q    And if you look at the top there, what Ten Oaks told

19  Boeing was that, quote, "ASTECH will make investments in key

20  equipment upgrades to reduce risk of downtime and improve

21  overall quality, mostly around the panel fabrication process

22  area, which was not possible under prior ownership," close

23  quote.  Correct?

24  A    That's what it says.

25  Q    All right.  That's what Ten Oaks told Boeing in order

1   to induce its consent to this transfer of the supply

2   contract; right?

3   A     That's what this document says.

4   Q     And three very specific things they talked about doing

5   that would result in increased efficiencies over time and

6   thus reduce costs; do you agree?

7   A     No, I can't necessarily agree to that.  These were

8   three capital investments that they said were potential to

9   improve the performance.

10  Q     Well, they didn't say potential, they said will make

11  investments, and then they laid them out there on the page;

12  correct?

13  A     The document speaks for itself.

14  Q     And none of those have occurred to date; correct?

15  A     None of these investments have occurred to date, but

16  other capital investments have.

17  Q     And in fact you couldn't even testify today as to the

18  costs that would be associated with these specific capital

19  improvement upgrades identified in this slide deck; correct?

20  A     Certainly not sitting here today.

21  Q     And in addition to representations around -- let me

22  take a step back.  Before we go to the next topic, let me

23  just talk about this for a moment.

24        That investment you referred to, that was one

25  investment and it was about $50,000, if I recall your

1 testimony correct; is that right?

2 A     That was an example of one investment.  There have been

3 several investments, I don't recall the exact amount of them,

4 but the first investment, capital investment was announced

5 the day the acquisition was announced.

6 Q     And those were all made with the cash on hand at the

7 time of close; is that correct?

8 A     That's correct.

9 Q     Again, there's been no cash infusion from Ten Oaks to

10 date; right?

11 A     Correct.

12 Q     And there's been no securing of a line of credit or

13 other third party financing to support the business; correct?

14 A     That's correct.

15 Q     And that too is contrary and inconsistent with what Ten

16 Oaks had told Boeing would happen post-closing; correct?

17 A     Contrary?  I'm not sure I would use that word, but --

18 Q     Well, my question is, isn't it the case, sir, that Ten

19 Oaks specifically represented to Boeing that it would secure

20 a line of credit in order to support the business, provide

21 runway for these capex improvements to result in increased

22 efficiencies; isn't that true?

23             MR. WILKINS:  I'm going to object, Your Honor --

24             THE WITNESS:  No.

25             MR. WILKINS:  -- I don't think there's a

1 foundation for this.

2          THE COURT:  Actually, I was going to go -- I'd

3 like to know how this is relevant to the decision to reject

4 the contract today.

5          MR. DEIS:  Yes, Your Honor.

6          THE COURT:  I certainly get the issues, concerns,

7 or frustrations with whatever negotiations and discussions

8 and whether someone was misled, et cetera.  If it goes to the

9 good faith filing question that we talked about, then I

10 understand, but otherwise it doesn't necessarily seem like it

11 would feed directly to the debtors' question of the exercise

12 of their business judgment for the motion that's before me.

13          MR. DEIS:  So I think there's two responses to

14 that --

15          THE COURT:  Sure.

16          MR. DEIS:  -- Judge, and Mr. Scott may correct me.

17          THE COURT:  No problem.

18          MR. DEIS:  I think the two responses are, number

19 one, that decisions have to be made on an informed basis.

20 And you've already heard certain problems, certain

21 deficiencies in terms of the analysis that was done, but the

22 complete flip-flop, Your Honor, supports the inference that

23 this was not done on an informed basis.  That is certainly a

24 fact that's probative to that question.

25          The second one is the good faith and that goes to

1  the standard that Your Honor should apply in considering

2  this.  It is certainly the case that in some instances

3  debtors are entitled to business judgment, but not in an

4  instance of bad faith or other instances of -- to call into

5  question whether this is an independent exercise of judgment.

6          THE COURT:  Okay.

7          MR. DEIS:  The witness' vested financial interest,

8  along with other indicia, I think, might give Your Honor

9  reason to apply a different standard.  We would certainly

10 submit that that would be the case.

11         THE COURT:  Okay.

12         MR. SCOTT:  Your Honor, Sean Scott.  May I add one

13 point there?

14         THE COURT:  Sure.

15         MR. SCOTT:  Your Honor, I do think it goes to the

16 point that I raised earlier, which is there's been a

17 presumption on the unprofitability of these contracts, it's a

18 static review, it doesn't incorporate any analysis as to

19 improvements on various efficiencies and, for that reason, we

20 don't think they're entitled to deference on that business

21 judgment because there's been no analysis of could

22 profitability be improved by measures other than simply

23 extracting customer concessions.

24         THE COURT:  Okay, I understand.  You may proceed.

25         MR. DEIS:  Thank you, Judge.

1  BY MR. DEIS:

2  Q     So if we turn then to page 11, in addition to the

3  specific representations made by Ten Oaks as to capital

4  investments that would be made that would improve the

5  profitability of the business, there was also day 30, day 30

6  through 60, and day 60 through 90 plans that were laid out

7  there.  Do you see that?

8  A     I do.

9  Q     And, again, there's quite a number of these.  I don't

10  know if we need to go through them individually, but we

11  talked about them today.  You would agree with me that we

12  were able to identify a number of these that have not to this

13  point been implemented; is that fair?

14  A     That's correct.

15  Q     And, by the way, did Ten Oaks ever mention during the

16  process of getting Boeing's consent that, hey, you know what,

17  one of the things we might want to do is talk about price

18  increases, was that ever brought up?

19  A     There was conversation about pricing during the meeting

20  with Boeing in February of 2022.  A representative of Boeing

21  made a comment that, under the contract, price increases were

22  not available.  And the representative from GKN that was in

23  the meeting, a woman by the name of Lori Day, corrected the

24  representative of Boeing and said that that is not true,

25  price increases are available under the contract.

1  Q     My question is different.  There was no statement by

2  Ten Oaks that price increases would be part of its 30-day,

3  60-day, or 90-day plan; correct?

4  A     That's correct.

5  Q     Now, the other thing I wanted to ask you about was the

6  representations that Ten Oaks made in terms of the line of

7  credit it was going to obtain and financing, additional

8  capital infusion might be expected from Ten Oak post-close;

9  do you recall that question?  Do you recall those questions?

10 A     Not specifically, but in general.

11 Q     All right, let's see if we can refresh your

12 recollection.

13        MR. DEIS:  This will be Exhibit 3.  And, for the

14 record, Exhibit 3 is Bates stamped Debtor 4554.

15     (Pause)

16        MR. DEIS:  May I approach, Judge?

17        THE COURT:  Of course.  Mr. Deis, you have leave

18 to approach --

19        MR. DEIS:  Okay.

20        THE COURT:  -- as you would.

21        MR. DEIS:  Thank you.

22        THE WITNESS:  Thank you.

23        MR. DEIS:  Two years later, they haven't beaten

24 the habit out of me --

25     (Laughter)

1           THE COURT:  There you go.

2           MR. DEIS:  -- I apologize.

3  BY MR. DEIS:

4  Q    Let me know when you're ready for my first question,

5  Mr. Richardson.

6  A    I have the document in front of me, so I think I'm

7  ready.

8  Q    All right.  So you can see, if we look at the last

9  thread, which is on page Bates stamped 4554, there's an email

10 exchange between yourself, Mr. Greiner, and Mads Adams and

11 Andrew Lovrovich; do you see that?

12 A    I do.

13 Q    You've already explained to the Court who Mr. Lovrovich

14 is.  Mads Adams, that's the acting CFO for the company; is

15 that right?

16 A    He's not acting CFO, he is the CFO.

17 Q    All right, but he's also at Ten Oaks; correct?

18 A    He's also a Ten Oaks operating partner.

19 Q    Okay.  And Curtis Greiner is also the general counsel

20 at Ten Oaks; is that right?

21 A    That's correct.

22 Q    All right.  And you can see that the subject of the

23 email is "Boeing questions regarding GKN Aerospace Chem-

24 Tronics."  Do you see that?

25 A    I do.

1  Q     All right.  And the date of the email is May 31st,

2  2022; do you see that?

3  A     I do.

4  Q     Now, if you go back, you can see this forwards an email

5  chain that goes back to February of 2022.  For example, if

6  you turn to the next page ending in Bates 4555, that's an

7  email chain dating back to February 9th of 2022.  Do you see

8  that?

9  A     I do.

10  Q     All right.  And that's prior to the time the

11  acquisition of ASTECH closed; right?

12  A     Yes.

13  Q     Okay.  And this is a response from Austin Smith at Ten

14  Oaks; do you see that?

15  A     I do.

16  Q     All right.  And what he's responding to is a prior

17  email, which is found on Bates Debtor 4556, an email from a

18  Mr. Hans, Rajpaul Hans (ph) at Boeing, from February 8th,

19  2022; do you see that?

20  A     I do.

21  Q     All right.  And he says, "Just a few more questions, I

22  swear.  I know it is indicated that Ten Oaks will look to

23  secure a line of credit for ASTECH after the transaction is

24  final, but are there any additional lines of funding

25  available to ASTECH?  Would Ten Oaks be willing to inject

1   cash infusions, if necessary?  How much of a line of credit

2   is Ten Oaks looking to supply ASTECH with?"

3        Those were the questions Boeing put to Ten Oaks;

4   correct?

5   A     Yes.

6   Q     And then, if you turn to Mr. Austin Smith of Ten Oaks'

7   response on Bates Debtor 4555, you can see there below he

8   responds to Mr. Hans' questions; correct?

9   A     Yes.

10  Q     All right.  And, for example, number 1, italicized,

11  that's the question, and then the answer is under 1(a),

12  quote, "ASTECH will start with a cash balance of

13  approximately five million, then will seek to add a line of

14  credit, and, lastly, has access to Ten Oaks' meaningful

15  family office equity capital available for further

16  investment," close quote.  Do you see that?

17  A     I do.

18  Q     And that's what Ten Oaks told Boeing as part of the

19  process of securing Boeing's consent to the assignment?

20            MR. WILKINS:  I'm going to object, Your Honor.  I

21  do want to move it along.  Mr. Richardson -- it's

22  foundational -- Mr. Richardson is copied on one email in May,

23  all these other emails do not include him, I don't believe,

24  and they go back to February, and there's no foundation that

25  Mr. Richardson saw these, knew these at the time, or anything

1 else.

2          MR. DEIS:  Well --

3          THE COURT:  Actually, I'm going to overrule the

4 objection.  I understand the concern, but I think Mr.

5 Richardson has testified pretty broadly regarding his

6 understanding.  He's also testified that I don't believe he

7 was in the middle of the acquisition process.  So, to the

8 extent he feels that he can testify or comment on these, I'll

9 allow him to do so.

10          MR. DEIS:  Thank you, Judge.

11 BY MR. DEIS:

12 Q    Mr. Richardson, the question is simply that you can see

13 Ten Oaks represented that it would seek -- that it will seek

14 to add a line of credit; correct?  That's what Mr. Smith said

15 in his response to Mr. Hans; right?

16 A    I don't think that that's what that says.

17 Q    Well, why don't we read it.  "ASTECH will start with a

18 cash balance of approximately five million, then it will seek

19 to add a line of credit, and, lastly, has access to Ten Oaks'

20 meaningful family office equity capital available for further

21 investment."  That's what Mr. Smith said to Mr. Hans;

22 correct?

23 A    It says, "then will seek to add a line of credit," yes.

24 Q    All right.  And, in addition, he also said that "Ten

25 Oaks has strong relationships with its preferred lender base,

1  to which we have partnered with on several of our portfolio

2  company holdings, and has been able to secure financing on an

3  expedited basis whenever necessary."

4       That was another thing that Mr. Smith said to Mr. Hans

5  in response to his question about liquidity needs of the

6  company; correct?

7  A    Correct.

8  Q    And, again, sitting here today, the company, ASTECH,

9  post-closing of the acquisition, has not been in contact with

10 any financial institutions about a line of credit; correct?

11 A    Not correct.

12 Q    Sir, you testified this morning that you were unaware

13 of any discussions that had occurred between ASTECH and any

14 financial institutions relating to a line of credit; are you

15 changing that testimony under oath?

16 A    What I said this morning was that ASTECH had been in

17 touch with a third party who was charged with seeking to

18 obtain a line of credit and then later stopped that process.

19 Q    But, again, my question was whether there were any

20 communications, whether between that third party or ASTECH

21 itself, with any actual lenders.

22 A    And, as I answered this morning, I believe I said I'm

23 unaware of any.

24 Q    And you're the executive chairman of the company;

25 correct?

1  A      Correct.

2  Q      And nor have there been any capital infusions from Ten

3  Oaks; correct?

4  A      Correct.

5  Q      In fact, ASTECH hasn't even asked Ten Oaks for

6  additional capital infusions to potentially provide runway to

7  prevent some of these other efficiencies to improve the

8  profitability of the company, that hasn't even happened;

9  right?

10  A      Correct.

11  Q      And maybe we should have started here, but the purpose

12  of filing the bankruptcy petition was simply to increase

13  ASTECH's position for purposes of negotiating price increases

14  with Boeing and the other customers; correct?

15  A      The purpose was to certainly establish a working

16  process for working to obtain price increases that made the

17  business make sense on a go-forward basis.

18  Q      Again, you were deposed this morning; correct?

19  A      Correct.

20  Q      And you were under oath and you understood you were to

21  testify truthfully; correct?

22  A      Correct.

23  Q      And you did testify truthfully; did you not?

24  A      I did.

25  Q      And you were asked the question, "What were the

1 purposes in filing for bankruptcy?"

2     Answer, "To get the company into a better position to

3 be able to negotiate with the customers to achieve better

4 pricing that would allow the business to become cash flow-

5 positive, to be able to support the customers and the other

6 constituencies of the business."

7     You were asked that question and provided that answer;

8 did you not?

9 A    I believe that's correct, it sounds correct.

10 Q    And you also testified that there weren't any other

11 purposes to the filing; correct?

12 A    Correct.

13 Q    There's been no attempt to put together a bankruptcy,

14 an emergence plan, to this point in the process post-filing;

15 is that fair?

16 A    No.  I think we talked about that this morning and I

17 said that we would be submitting a plan to customers for

18 requested price increases by the end of this week and that by

19 the time we get to -- well, I don't think I got there, but by

20 the time we get to October, we would have a plan.

21 Q    My question is, separate and apart from price

22 increases, I'm talking about an emergence plant that

23 considers the other steps for restructuring that you would

24 propose aside from price increases, that process has not

25 started within ASTECH; correct?

1  A      Correct.

2  Q      You haven't talked about potential financing options

3  that you'd look for post-emergence; correct?

4  A      Correct.

5  Q      Capital infusion from Ten Oaks; right?

6  A      Correct.

7  Q      And there's certainly been no discussions about in any

8  way diluting ASTECH Holdings' equity interest in ASTECH, have

9  there?

10  A      There have not.

11  Q      And not your five percent; right?

12  A      There have not.

13          MR. DEIS:  May I have a moment, Your Honor?

14          THE COURT:  Of course.

15      (Pause)

16          MR. DEIS:  Nothing further, Your Honor.

17          THE COURT:  All right.  Any redirect?

18          MR. WILKINS:  I don't think so, Your Honor.

19          THE COURT:  Thank you, Mr. Richardson.  You may

20  step down.

21          THE WITNESS:  Thank you.

22      (Witness excused)

23          MR. WILKINS:  Your Honor, ASTECH would call Joshua

24  Teeple.

25          THE COURT:  All right.  Mr. Teeple, please remain

1  standing.

2          We'll swear the witness.

3                  JOSHUA TEEPLE, WITNESS, SWORN

4          THE CLERK:  Please state and spell your name for

5  the record.

6          THE WITNESS:  Joshua Teeple.

7          THE COURT:  Spell your last name for the record,

8  please.

9          THE WITNESS:  T, as in Tom, e-e-p, as in Paul, l-

10  e.

11         THE COURT:  Very good.  Welcome, sir.

12         THE WITNESS:  Thank you, sir.

13                  DIRECT EXAMINATION

14  BY MR. WILKINS:

15  Q    Mr. Teeple, did you fly in from California yesterday so

16  you could sit for the deposition at 8:30 this morning?

17  A    Yes.

18  Q    Could you summarize your educational background and

19  your professional experience, please?

20  A    Certainly.  I'm a graduate of the University of

21  Colorado in Boulder, Colorado; I graduated in 1997 with a

22  Bachelor of Science degree in business administration.  I've

23  been in public practice since 1997, focused on areas in

24  insolvency litigation, restructure, things like that.  I'm a

25  certified public accountant, certified in the states of

1  California and Nevada.  I'm a certified fraud examiner; I'm

2  certified in financial forensics.  I'm a certified

3  information systems auditor and I'm a certified information

4  technology professional.

5  Q     And are you a principal of the firm of Grobstein

6  Teeple?

7  A     I'm a partner there, yes.

8  Q     Has your firm been engaged and now formally employed by

9  ASTECH Engineered Products, the debtor in this case?

10 A     Yes.

11 Q     And about when was Grobstein Teeple engaged by ASTECH?

12 A     I think at the very end of July, beginning of August.

13 Q     What did you understand your initial assignment to be?

14 A     I was engaged to assist the debtor with accounting

15 issues that may arise in the course of its bankruptcy

16 proceeding.

17 Q     Were you asked to perform a profitability analysis?

18 A     Yes.

19 Q     And that was customer by customer and part by part?

20 A     Correct.

21 Q     Did you do that?

22 A     Yes.

23 Q     Could you explain sort of the process and methodology

24 you went through to perform that analysis, please?

25 A     Yeah, so it was a ground-up analysis whereby we had to

1  obtain the data related to the cost to manufacture each

2  product, the cost to ASTECH to manufacture each product,

3  direct costs and then plant overhead costs that would be

4  allocated to those products.  And then we identified the

5  sales price for the products and obtained information to how

6  many units of each product was going to be produced through

7  December 2023 and projected out the -- for each product,

8  projected out the revenue, the cost of sales related to each

9  one of those products, and then gross profit and gross margin

10  for each product.

11  Q    And was part of that process you took in information

12  referred to as bills of material or BOMs?

13  A    Yes, the bills of material were developed by debtor

14  management and employees at the debtor, and it reflects their

15  best estimate and current understanding of the cost to

16  produce each part --

17  Q    All right.

18  A    -- or product.

19  Q    And you testified you also saw the debtor's order book

20  of parts in the pipeline?

21  A    That's correct.

22  Q    All right.  And, based upon all that, did you then

23  project out the production and production costs through the

24  end of 2023?

25  A    Yes, correct, for that 17-month period.

1  Q     And did one of ASTECH's customers also ask you to do

2  the same analysis out through 2026?

3  A     Yes, and that ends up being a 53-month period.

4  Q     And you refer to this analysis -- or I'll refer to the

5  analysis in short term as -- in short as the gross margin

6  analysis?

7  A     Yes.

8  Q     Okay.  With respect to the gross margin analysis that

9  you did, does that analysis include the parts schedule for

10 production?

11 A     Yes.

12 Q     The estimated labor hours per part --

13 A     Yes.

14 Q     -- or per unit?

15       The total estimated labor cost on production during the

16 time period?

17 A     Yes, for the 17 months into December 2023.

18 Q     And it includes the current average sales price per

19 unit?

20 A     Correct.

21 Q     Current estimated cost per unit?

22 A     Direct costs, yes.

23 Q     And also the plant overhead allocation per unit?

24 A     Correct.

25 Q     After doing all that work, were you able to draw any

1 general conclusions about ASTECH's overall book of business?

2 A    It appeared, based on the data that I obtained, that

3 ASTECH was manufacturing a number of parts where it was

4 actually incurring a negative gross profit and a negative

5 gross margin.

6 Q    It was costing them more than they were able to sell

7 them for?

8 A    Correct.

9 Q    Now, was your report reviewed and discussed with --

10 reviewed by and discussed with ASTECH's senior management

11 team?

12 A    Yes.

13 Q    All right.  Based on the work you did, did you form an

14 opinion as to the ASTECH book of business for Boeing?

15 A    Yes.

16 Q    And what is that opinion?

17 A    There are four parts reflected on the gross margin

18 analysis that are Boeing parts, two of those parts have a

19 positive gross margin and positive gross profit and two of

20 those parts have negative gross profit and negative gross

21 margin.

22 Q    And were you able to project out over the 17-month

23 period that you mentioned how much money would ASTECH be

24 losing on the Boeing book of business over that time period?

25 A    Well, to the best of my recollection, the two parts

 1  that have a negative gross profit in the projection, in the

 2  gross margin analysis, it would cost approximately $5.7

 3  million to produce those parts.

 4  Q    And that's now to the end of 2023?

 5  A    Correct.

 6            THE COURT:  So I want to make sure I understand

 7  that number.  The witness' testimony then, sir, is that, if

 8  we played this string out until the end of 2023, made the

 9  parts, sold the parts, ASTECH would be under water to the

10  tune of $5.7 million, it would have lost $5.7 million on

11  those products?

12            THE WITNESS:  Yeah, specific to those two

13  products, Your Honor, and that's just based on debtor

14  management's current understanding to produce those parts and

15  the sales price that they realize on those parts.

16            THE COURT:  Okay.  Thank you.  My apologies for

17  the interruption.

18            MR. WILKINS:  No, you asked a more artful question

19  than I did, so I appreciate that.

20  BY MR. WILKINS:

21  Q    Were you asked to participate and present in one-on-one

22  meetings with ASTECH's four largest customers?

23  A    It wasn't one-on-one because there were multiple

24  parties from the debtor's side and the customer's side, but

25  yes, I did participate.

1  Q     Yeah, I didn't mean to imply it was you by yourself.

2  It was ASTECH and a customer, ASTECH and another customer?

3  A     Yes.

4  Q     All right.  And did you do that?

5  A     I did.

6  Q     All right.  And did you walk each of the customers

7  through your gross margin analysis?

8  A     Yes, I did.

9  Q     And did you do that with the Boeing business team?

10 A     Yes, I did.

11 Q     Do you recall that meeting, which was virtual, back on

12 August 24th, thereabouts --

13 A     I recall that meeting --

14 Q     -- we'll call it?

15 A     -- yes.

16 Q     I'm sorry.  And at the conclusion of each of those

17 meetings were the customers encouraged to reach out to you

18 directly if they had any questions, comments, or input on

19 your work?

20 A     Yes.

21 Q     All right.  After the meeting with Boeing, did anybody

22 from Boeing's business team reach out to you directly for

23 that purpose?

24 A     No.

25            MR. WILKINS:  That's all I have, Your Honor.

1          THE COURT:  All right.  Cross?

2          MR. VANZURA:  Your Honor, may I?  Thank you.

3          THE COURT:  Sure.

4                    CROSS-EXAMINATION

5  BY MR. VANZURA:

6  Q    Good afternoon, Mr. Teeple.

7  A    Good afternoon.

8          MR. VANZURA:  Your Honor, Glenn Vanzura, Mayer

9  Brown, for Boeing.

10          THE COURT:  Welcome.

11          MR. VANZURA:  Thank you, Your Honor.

12  BY MR. VANZURA:

13  Q    Mr. Teeple, we meet again.  We met this morning;

14  correct?

15  A    We did.

16  Q    Okay.  I'd like to start where you left off just a

17  moment ago and I think you testified, or the question was put

18  to you, that if you played this string out, referring to

19  projecting gross profit for the four Boeing parts for the

20  next -- excuse me, for the one major Boeing part for the next

21  17 months, that that would result in a $5.7 million loss for

22  ASTECH; is that right?

23  A    I believe what I said was for the two growing -- Boeing

24  parts where the debtor realizes the negative gross margin,

25  that for the 17-month period, the debtor would realize a

1  $5.7 million negative gross profit on those two parts.

2  Q    I appreciate that clarification.  Let's step back for a

3  moment.

4       There are four Boeing parts, correct?

5  A    Correct -- I'm sorry, there's four Boeing parts on the

6  gross margin analysis just to be clear.

7  Q    For two of those four parts, your projection is that

8  ASTECH will have a profit on the manufacture and sale of

9  those parts to Boeing over the next 17 months, correct?

10 A    A gross profit, yes.

11 Q    Okay.  And for the other two parts, you project over

12 the next 17 months a $5.7 million negative gross profit for

13 the sale of those parts by ASTECH to Boeing, correct?

14 A    Correct, based on what is scheduled to be produced by

15 ASTECH for those 17 months.

16 Q    Of that $5.7 million loss, do you know how much is

17 attributable in your model to overhead?

18 A    I don't know.  I'd have to look at the model to tell

19 you the exact number.

20 Q    Would it surprise you to know that it is $6.2 million?

21 A    I don't know what the number is, but I know that the

22 overhead is high.

23 Q    We'll get to the -- we'll introduce the model in just a

24 moment.

25 Mr. Teeple, if, in fact, the overhead accounts for

1  $6.2 million of the $5.7 million loss that you were

2  projecting, is it the case that that $6.2 million in cost

3  will be borne by ASTECH, whether the Boeing contract is

4  rejected or not?

5  A    I would agree with you for the fixed costs of the plan

6  overhead.  There's very little costs in there that would go

7  away if Boeing's contracts were rejected.

8  Q    And would you agree with majority of the overhead costs

9  are fixed costs that ASTECH will incur whether or not the

10 Boeing contracts are rejected?

11 A    Yeah, I don't have the exact percentage, but I think it

12 is a majority.

13 Q    Okay.  We'll come back to that in a moment.  Thank you

14 for that.

15      I'd like to now start with some of your credentials to

16 make clear for the Court.  Am I correct that you do not have

17 an accounting degree?

18 A    No, I have a degree in business administration.

19 Q    And that is not an accounting degree, correct?

20 A    That's correct.

21      THE COURT:  Hang on.  I believe the witness

22 testified he's a certified public accountant.

23      MR. VANZURA:  That's correct, Your Honor, but

24 we'll get to that.

25      THE COURT:  Okay.

1  BY MR. VANZURA:

2  Q     I did ask you this morning whether there are any

3  degrees or coursework that qualify you to perform a

4  profitability or a gross margin analysis.

5        Do you remember that?

6  A     I do.

7  Q     And you identified one course, an undergraduate course

8  more than 25 years ago in cost accounting; is that correct?

9  A     That's correct.

10 Q     You also cited your cost accounting experience; is that

11 right?

12 A     Yes.

13 Q     And you described two experiences, do you remember

14 that?

15 A     I don't remember.  It was a long time ago.

16 Q     Let me see if I can help you.  First, do you remember

17 that your experience in connection with your work as a

18 financial statement auditor more than 20 years ago qualified

19 you to perform a profitability analysis?

20 A     I believe what I said is that I looked at profitability

21 and cost accounting and part of being a financial statement

22 auditor.

23 Q     And that was more than 20 years ago, correct?

24 A     Yeah, I have not audited financial statements since, I

25 think since the early 2000s.

1  Q      Now, in fairness to you, you also identified gross

2  margin analyses that you had performed for other clients more

3  recently; is that right?

4  A      Yes.

5  Q      But you could not identify any such specific clients or

6  engagements; is that right?

7  A      That's correct.

8  Q      And you would agree that ASTECH manufactures parts for

9  use in the aerospace industry; is that right?

10  A      That's my understanding, yes.

11  Q      And your recollection is that you have performed work

12  concerning the aerospace industry in two previous

13  engagements; is that right?

14  A      That sounds right.

15  Q      Okay.  But you don't recall any specifics of those

16  engagements?

17  A      I think that I testified that one of them might have

18  been -- was a debtor in a bankruptcy proceeding.  I thought I

19  said that.

20  Q      But you don't recall any of the work that you actually

21  performed in connection with those two engagements; is that

22  right?

23  A      That's correct.

24  Q      And you don't recall any specific knowledge, expertise,

25  or experience that you acquired from those two previous

1   engagements that had any bearing on your analysis or opinions

2   in this matter; is that right?

3   A     I think that's correct, yes.

4   Q     Now, to reset for a moment, is it fair to say you

5   understand that the debtor is asserting here that the Boeing

6   contracts are unprofitable for ASTECH, right?

7   A     I believe that's correct, yes.

8   Q     And you understand that that assertion is based on your

9   bankruptcy process margin or profitability analysis?

10  A     In part.  I don't know when debtor management

11  identified this as about issue with regard to Boeing,

12  specifically.

13  Q     I'm going to read to you, sir, from the debtor's reply

14  in support of its pending motion, in which it writes:

15         "GT completed the requested work and it was

16  reviewed by the debtor's management team.  This gross margin

17  analysis was then shared individually with the debtor's four

18  key customers, including Boeing."

19         THE COURT:  Right.  That's paragraph 4 of the

20  reply.

21         MR. VANZURA:  That's correct.

22  BY MR. VANZURA:

23  Q     And as indicated in the debtor's rejection motion, that

24  gross margin analysis you performed shows the loss, and they

25  described it as a very significant overall loss on the

1  debtor's part for Boeing.

2       Do you understand that?

3  A    Yes.

4  Q    And so, you understand that that assertion that there's

5  a very significant overall loss on the debtor's work for

6  Boeing is based on your gross margin analysis?

7  A    That's understood.

8  Q    Okay.  Now, you described during your direct testimony,

9  you described it as a "ground-up analysis"; is that right?

10 A    Yes.

11 Q    And then you were taken through several inputs for your

12 gross margin model, including parts costs, labor hours, labor

13 costs, average current prices, direct costs, and plan

14 overhead.

15      Do you remember that testimony?

16 A    Yes.

17 Q    Is it the case, sir, that you obtained all of that

18 information, all of that data from the debtor?

19 A    All of the underlying data was provided from the

20 debtor, correct.

21 Q    You did not do anything and no one on your team did

22 anything to obtain data for use in your model, other than the

23 data that the debtor provided to you?

24 A    Just collaborating with the debtor to get the inputs

25 that we needed for the model, correct.  We didn't do anything

1  beyond that.

2  Q     And, in fact, there were assumptions made in your model

3  about costs increasing over the 17-month projection period;

4  is that right?

5  A     Correct.

6  Q     And you assumed a 4 percent increase in those costs and

7  that was for direct labor and raw materials; is that right?

8  A     I didn't make that assumption.

9  Q     You used that as a cost escalator for your 17-month

10 projection, correct?

11 A     Yes, I used the escalator provided by debtor

12 management.

13 Q     And that's my point, that number, as well, came from

14 the debtor, correct?

15 A     That's correct.

16 Q     Did you know that it was the debtor's goal for your

17 assignment to provide the most persuasive case to the

18 customers and the Court for the debtor's reorganization plan

19 in regard to customer price increases?

20 A     No, I did not.

21 Q     Do you remember we showed you an email authored by the

22 debtor this morning, in which the debtor described that as

23 the goal for your assignment?

24 A     I remember you showing me that email.

25 Q     And you testified that you wanted to obtain the best

1  estimate of the debtor's cost to manufacture each of the

2  parts for each of the customers; is that right?

3  A     Yes, that's what I was working with debtor management

4  and their employees on, was to try to obtain their most

5  accurate numbers with what it is actually costing the debtor

6  to manufacture the parts today.

7  Q     Okay.  Now, the cost to manufacture each part, again,

8  that was provided to you by the debtor, right?

9  A     Correct.

10  Q     That cost is a total cost made up of several costs,

11  correct?

12  A     The direct costs, yes.

13  Q     So, for example, labor costs?

14  A     Yes.

15  Q     Raw material costs, correct?

16  A     Yes.

17  Q     And all of those numbers came from the debtor, correct?

18  A     Correct.

19  Q     You don't know specifically where the debtor sourced

20  the data for each of those separate costs, correct?

21  A     I think what I testified to is that the debtor pulled

22  it out of whatever systems the debtor employees and

23  management had access to and they, you know, summarized it or

24  averaged it and used current costing and tried their best to

25  follow my instructions to tell me how much does it cost the

1  debtor today to produce each part.

2  Q    And when you say that the debtor pulled it out of the

3  systems, in fact, you testified this morning that the debtor

4  could have created that data out of thin air and you wouldn't

5  know whether they had or not; is that right?

6  A    Yes, I said, hypothetically, they could have just

7  pulled it out of thin air.

8  Q    And that's because you did not do anything at all to

9  assess the accuracy or the completeness of the data that the

10 debtor provided to you for each of the costs to produce these

11 parts?

12 A    Correct.  And I think I said that explicitly in my

13 declaration.

14 Q    And, in fact, for each of the inputs in your model that

15 you obtained from the debtor, you did not do anything to

16 assess the accuracy or completeness of that data?

17 A    That's correct.

18 Q    Okay.  You plugged that data into a spreadsheet and

19 then did some basic math; is that right?

20 A    I don't know how basic it was, but yes, I did put it

21 into a model and created the model.

22 Q    Well, we talked about it this morning.  It was

23 addition, correct?

24 A    Addition, yes.

25 Q    Subtraction?

1    A      Yes.

2    Q      Multiplication?

3    A      Yes.

4    Q      And division?

5    A      Yes.

6    Q      Anything else?

7    A      As far as mathematical equations built into the

8    formulas, I think that's probably the ones that it covers.

9            THE COURT:  Those four things will get you to the

10   moon, you know.

11           (Laughter)

12           MR. VANZURA:  That's true, Your Honor.  My 11-

13   year-olds unfortunately are now beyond those four things, and

14   so when I say "basic math" I mean math I can understand.

15           THE COURT:  I think we're in the same boat.  I'm

16   just busting your chops.

17           (Laughter)

18   BY MR. VANZURA:

19   Q     So, the bottom line is you don't know whether it's the

20   debtor's best estimate.  All you know is these are the

21   numbers that the debtor gave you.  You used them without

22   investigating them any further; is that right?

23   A     The debtor represented to me, debtor management and

24   their employees, that this is the best information that they

25   had as to inputs into the gross margin analysis.

1  Q     Now, you also allocated an estimate for overhead costs

2  among each of the parts you analyzed, correct?

3  A     That's correct.

4  Q     And that's not just the Boeing parts, but all of the

5  parts that ASTECH produces?

6  A     Correct -- or, I'm sorry, just to be clear -- scheduled

7  it be produced in the next 17 months.

8  Q     Fair enough.

9        And to allocate that, you base that on labor hours that

10 the debtor estimates it will require to produce these parts;

11 is that right?

12 A     Yes, for the next 17 months, correct.

13 Q     And you talked this morning that there are other

14 methodologies that one could use to allocate overhead; is

15 that right?

16 A     Yes.

17 Q     But you did not consider any other methodologies; is

18 that right?

19 A     I believe what I testified was I had discussions with

20 debtor management and there was not another methodology for

21 which there was data to do that allocation or any others that

22 made sense.  I think it was the best allocation method that

23 we could come up with.

24 Q     You did not perform your analysis using any other

25 allocation method; is that right?

1  A     That's correct.

2  Q     Do you recall that Mr. Richardson testified a moment

3  ago that ASTECH experienced a record level of production in

4  August?

5  A     I believe I remember him saying that, yes.

6  Q     Okay.  Did your analysis projecting gross profit for

7  the Boeing parts over the next 17 months take into account

8  the record level of production in August or going forward

9  over the next 17 months?

10 A     No, it's based upon what is scheduled to be produced in

11 the order book over the next 17 months, the debtor's order

12 book.

13 Q     Now, we also heard testimony from Mr. Richardson about

14 the 9.4 EBITDA margin target, do you recall that?

15 A     I do.

16 Q     Your model is designed to determine how much the debtor

17 should raise prices on each part to achieve an overall 9.4

18 percent EBITDA margin; is that right?

19 A     Over the 17-month period, that's correct.

20 Q     And once again, just like all the other inputs to your

21 model, that 9.4 percent margin target came from the debtor;

22 is that correct?

23 A     That's correct.

24 Q     And specifically, it came from Mr. Richardson?

25 A     That's correct.

1   Q      And you testified that you have no idea where that

2   number came from; is that right?

3   A      I think that I said that he had some sort of market

4   study or something like that, but I wasn't aware of which

5   one.

6   Q      And you weren't familiar with that market study,

7   correct?

8   A      No, I am not.

9   Q      You have no idea what went into that market study?

10  A      I do not.

11  Q      You have no idea of the reliability of that market

12  study?

13  A      I do not.

14  Q      And that 9.4 percent margin represents, to your

15  understanding, an average for the industry, correct?

16  A      I think that's my understanding, yes.

17  Q      Which necessarily suggests that some companies in the

18  industry achieve an EBITDA of less than 9.4 percent, correct?

19  A      Yes.

20  Q      Others achieve more?

21  A      Yes.

22  Q      And you don't have any idea whether the 9.4 percent

23  EBITDA margin is an accurate, common, or reasonable target

24  for the debtor's industry, do you?

25  A      I do not have an opinion on that.

1  Q      You don't whether the debtor needs to achieve a 9.4

2  percent EBITDA margin to be profitable?

3  A      I don't know because I don't know the below the EBITDA

4  line costs, the income taxes, appreciation and amortization,

5  so I don't know what the break-even point is there to be

6  profitable.

7  Q      So, the debtor may be profitable at less than a 9.4

8  percent EBITDA, right?

9  A      It's possible.

10  Q      You just don't know?

11  A      I just don't know.

12  Q      You didn't do that analysis?

13  A      Correct, I did not.

14  Q      You don't know whether the debtor needs to achieve a

15  9.4 percent EBITDA margin to execute on its reorganization

16  plan, do you?

17  A      I do not.

18  Q      In fact, you have no idea what the debtor's

19  reorganization plan is?

20  A      I do not.

21  Q      They haven't told you?

22  A      They have not.

23  Q      You don't know whether the debtor needs to achieve a

24  9.4 percent EBITDA margin to successfully emerge from

25  Chapter 11, do you?

1  A     I do not.

2  Q     I think you testified a moment ago it's possible,

3  although you don't know, that the debtor could be profitable

4  at less than 9.4 percent EBITDA; is that right?

5  A     It's possible, yes.

6  Q     It's also possible that the debtor could be and remain

7  solvent at less than 9.4 percent EBITDA; is that right?

8  A     It depends on your measurement for solvency.  A

9  positive EBITDA, I don't know if that necessarily equates to

10 solvency.

11 Q     You just don't know one way or the other?

12 A     That's correct, as I sit here, I do not know.

13 Q     And when Mr. Richardson gave you the 9.4 percent EBITDA

14 margin target to use in your analysis, did he tell you that

15 that margin would give the debtor's investors a roadmap to a

16 $20 million exit from the business?

17 A     No, he did not.

18 Q     Now, returning to your model for a moment, is it fair

19 to say that you accepted the data provided by the debtor

20 without any further investigation as to its source, accuracy,

21 or completeness?

22 A     Beyond some, you know, back-and-forth communications,

23 because I was working with the debtor and debtor management

24 and debtor employees to come up and understand what these

25 numbers were, and that they were their best estimates of the

1  current costs to produce the parts, I did not do anything

2  further to -- beyond their representation that that was their

3  best estimate.  I did not do anything further.

4  Q    You also did not review any of the calculations the

5  debtor may have performed to arrive at the numbers it

6  provided to you?

7  A    I did not.

8  Q    Now, am I correct that you cannot represent to the

9  Court that the numbers and data the debtor provided and on

10  which your analysis, conclusions, and declaration rely are

11  accurate and complete?

12  A    Yes, and I say that in my declaration.

13  Q    You can't represent that to the Court, right?

14  A    I cannot.

15  Q    In your model, if the debtor rejects the Boeing

16  contracts, am I correct that you would need to allocate the

17  debtor's fixed costs to its other customers?

18  A    Yes, that's correct.

19  Q    And then to achieve the debtor's target of a 9.4

20  percent EBITDA margin, the debtor would need to raise its

21  prices on its other customers, even more than reflected in

22  your model; is that right?

23  A    That's correct.

24  Q    And you would agree that there are other ways that the

25  debtor could achieve profitability, other than raising prices

1  on its customers, right?

2  A    I would agree with that.

3  Q    But raising prices is the only approach considered in

4  your profitability analysis; is that right?

5  A    That's correct.

6  Q    Now, the debtor could, for example, achieve

7  profitability by implementing cost production measures or by

8  improving efficiencies, right?

9  A    I haven't done that analysis.  I don't know how much

10  improving inefficiencies [sic] would need to happen in order

11  for the debtor to become profitable, but theoretically, yes.

12  Q    And you heard Mr. Richardson testify a moment ago about

13  margins gained from efficiencies, do you remember that

14  phrase?

15  A    I don't remember, I'm sorry.

16  Q    And you don't know -- but you don't know whether the

17  debtor has any plans or could implement any cost reduction

18  measures or efficiencies to gain margin, you don't know that

19  one way or the other?

20  A    No, I don't think the focus is on that right now.  I

21  think it's on the price concessions.

22  Q    And your model didn't take that into consideration at

23  all, right?

24  A    It does not.

25  Q    And so, is it fair to say that you don't know whether

1  the debtor can or will achieve profitability over the next 17

2  months if it rejects the Boeing contracts?

3  A     I don't know.

4  Q     And you don't know whether the debtor can or will

5  achieve profitability of the next 17 months if it does not

6  reject the Boeing contracts?

7  A     I do not, sitting here, no.

8  Q     And you, also, don't know whether it's necessary for

9  the debtor to reject the Boeing contracts to achieve its 9.4

10 percent EBITDA margin target?

11 A     I don't -- as I sit here today, I know that if the

12 debtor does not give price concessions, then I don't see how

13 they can hit the 9.4 percent EBITDA margin.

14 Q     It's possible they could hit that margin through other

15 means, such as the efficiencies we've discussed, right?

16 A     It's possible.

17 Q     Through price concessions from other customers?

18 A     Correct.

19 Q     Okay.  And, finally, am I correct that you did not

20        perform any analysis to determine whether the debtor

21 will have a positive contribution margin for the Boeing parts

22 over the next 17 months?

23 A     Correct.

24 Q     Mr. Richardson, however, did testify a few moments ago

25 that the contribution margin for the Boeing parts is

1  possible, correct?

2  A      Correct.

3  Q      And he qualified that by saying that that contribution

4  margin does not consider any overhead; is that right?

5  A      Correct.

6  Q      Is it the case that ASTECH will continue to incur that

7  overhead, whether or not -- the fixed cost of that overhead,

8  whether the Boeing contracts are rejected?

9  A      Yes.

10 Q      And, in fact, if the Boeing contracts are rejected, you

11 agree that there will be less revenue available to ASTECH to

12 cover any portion of those fixed overhead costs?

13 A      Absent price concessions from the other customers, I

14 agree.

15             MR. VANZURA:  Nothing further.

16             Thank you, Your Honor.

17             THE COURT:  Okay.  Very good.

18             Any redirect?

19             UNIDENTIFIED SPEAKER:  No, Your Honor.

20             THE COURT:  All right.  Mr. Teeple, thank you,

21 sir.  You may step down.

22             THE WITNESS:  Thank you, Your Honor.

23         (Witness excused)

24             THE COURT:  Any other witnesses?

25             UNIDENTIFIED SPEAKER:  No other witnesses, Your

1  Honor.

2          THE COURT:  I don't think we have any issues with

3  documents.  Why don't we do this, I will extend my time to

4  3:45 and then I really do have to run.  What I would like to

5  do is just take a two-minute break and then I would like

6  closings, because I have some questions, and I would like the

7  parties to put all this together for me.

8          We'll stand in recess.  Three minutes.  Thanks.

9          COUNSEL:  Thank you.

10      (Recess taken at 3:24 p.m.)

11      (Proceedings resumed at 3:33 p.m.)

12      (Audio missing from recording at 3:33:11 through

13  3:35:54)

14          MR. WILKINS:  The Boeing book of business cost

15  ASTECH a great deal of money.  It is sinking the company.  It

16  is really not with a slow leak, either.

17          ASTECH didn't just spring this on Boeing a couple

18  of weeks ago.  It went to them in May and tried to get help

19  and got shut down.  It met with them in June after that and

20  tried to get help.  Nothing happened.  It filed bankruptcy,

21  nothing happened after that.  And nothing really changed

22  after our motion was filed -- excuse me -- on August 17th.

23                          So, rather than making any

24  effort to meaningfully engage with ASTECH, Boeing has elected

25  to ignore them and really just to battle them, and Your Honor

1   saw that today.  When we got here, you suggested maybe some

2   talks would be fruitful.  Sort of, yeah, good idea, but

3   instead, we got the Heisman and just the continued, you know,

4   fighting and battling we've gotten all the way through.

5   That's Boeing's prerogative, of course, but it's all the

6   debtor's prerogative, as a debtor in bankruptcy, to seek to

7   reject the contracts it determines are burdensome to the

8   estate and that's what ASTECH is doing here.

9           Your Honor, what should be a summary proceeding in

10  which the debtor's business decisions is afforded great

11  deference has been turned into a real fight.  As I mentioned

12  earlier, we received ASTECH's -- I'm sorry -- Boeing's

13  objection last Wednesday at the last possible hour.  They had

14  had our motion for three weeks.  We, because of the Court's

15  scheduling and the Labor Day weekend, we cranked out our

16  reply in less than 24 hours.  We received their massive

17  discovery request at midnight last Wednesday and we had

18  people work all weekend in order to comply with that, and we

19  did comply with that.

20          We flew people in from around the country for this

21  hearing, and we did that because it's important to the

22  debtor.  It means, in rejecting the contracts, that they have

23  a realistic chance to go forward and that's why we're here

24  today.  And that's why ASTECH needs, and really desperately

25  needs the Court to grant the motion that's been filed.

1          THE COURT:  Okay.  Thank you.

2          Mr. Scott?

3          MR. SCOTT:  For the record, Sean Scott, Mayer

4  Brown on behalf of the Boeing Company.

5          Your Honor, I'd like to address that last point.

6  There's been a number of points made from the podium today

7  that Boeing has not been constructive in these discussions.

8  With respect to the rejection motion itself, Your Honor, I'll

9  note that our reply was filed two weeks, our response was

10 filed two weeks after the rejection motion.  We had

11 requested --

12         THE COURT:  Wait a minute.  I have no issue with

13 the timing --

14         MR. SCOTT:  Sure.

15         THE COURT:  -- and we're here.

16         MR. SCOTT:  Your Honor, I think what it comes down

17 to is the customer response, including from Boeing, here, has

18 not been "no." From day one, we've been willing to be engaged

19 in negotiations.

20         Contrary to what you have heard, Boeing has asked

21 many questions during this proceeding, both before and after,

22 but I think, fundamentally, what it comes down to is, is the

23 debtor entitled to deference on its business judgment here

24 today?

25         You heard from the witnesses that there's a hole

1  to fill here.  If the contract is rejected and the debtor

2  ceases production, the Boeing contracts are contribution

3  margin positive.  Mr. Richardson testified this morning under

4  oath that there are no plans -- no plans -- to reduce fixed

5  or available costs for overhead following rejection of the

6  Boeing contracts; instead, the plan is to go back to Boeing

7  and try to renegotiate the contract.

8            That route -- this is not a garden-variety

9  rejection motion.  This is not a situation where a debtor has

10  decided that it has uneconomic contracts and needs to get out

11  from under them.  What you have is an unusual posture of a

12  Subchapter 5 where you have a debtor-in-possession that has

13  exclusivity, that is the one that is going to file a plan.

14  We don't know what that plan says.  We know that, at least to

15  date, there's been no discussion of additional capital

16  infusions, no discussion of financing.

17            THE COURT:  A 365 motion rarely implicates where a

18  debtor is headed with their plan, Sub 5 or not.

19            MR. SCOTT:  I agree with that, Your Honor, but I

20  think for purposes of today's motion, what you heard is that

21  the reason for the rejection, at least the stated basis for

22  the rejection, is that it holding down the debtor.  But when

23  the evidence was teased out, the fact is there's going to be

24  a bigger hole for the debtor.

25            In fact, you heard testimony that the only way

1 | that the debtor intends to fill that hole is to go to the
2 | other three customers and say, Congratulations, the hole that
3 | we asked you to fill is actually now larger because we
4 | rejected Boeing's contracts and, therefore, the fixed and
5 | variable costs that were allocated to Boeing are now your
6 | problem to solve.
7 |       There is no other creditor that has come here
8 | today that is in support of the rejection and the motion.
9 | It's not clear who benefits from the rejection of the
10 | contract, Your Honor.  So, I think, fundamentally -- I
11 | understand this is an unusual posture -- but where we come
12 | from it is, the evidence adduced today, we don't think there
13 | is reliable testimony on which the debtor can prove that
14 | these contracts are sinking the company; in fact, we think
15 | the debtor, on the evidence that they put forth, is worse off
16 | if the contracts are rejected and they elect not to continue
17 | to perform under the Boeing contracts.
18 |       THE COURT:  Okay.
19 |       MR. SCOTT:  Thank you, Your Honor.
20 |       THE COURT:  Sure.
21 |       All right.  I'm going to grant the motion and I
22 | will overrule the objection.  And I agree with Mr. Scott,
23 | this is an unusual motion and I have given it serious
24 | consideration and I am ruling promptly because of my own time
25 | and to the extent that I burden parties with my schedule, I

1  apologize to that.

2          Debtors take risks.  It is one of the things that

3  a debtor is afforded the prerogative to do.  A debtor can

4  make a decision that it wants to proceed and continue in a

5  relationship or it can make a determination in the exercise

6  of its business judgment that an asset of a company, being

7  contractual rights, are sufficiently burdensome, that they

8  wish to reject.  It is a basic proposition.  It is one of the

9  basic tools for a debtor under 365.  You can assume.  You can

10  assume and assign.  And you can reject.

11          The debtor has identified a contract that it deems

12  to be burdensome.  The counterparty to that contract notes

13  that, perhaps, that might not turn out very well for you.

14  Indeed, things could become worse.  That is a prospect that

15  is not novel and, again, it's rarely put in such stark terms,

16  but debtors often are in this court moving to reject critical

17  agreements and agreements that are significant to the

18  nondebtor contract counterparty and we, on rare occasion,

19  have fights over the wisdom of that process and this one has

20  been brought forth.

21          And, again, Boeing has raised significant concerns

22  about, first of all, whether this strategy will work, whether

23  or not it will, in fact, be a bigger hole, or Mr.

24  Richardson's testimony that we're losing on every part and

25  we're, simply, as a practical matter, better off if we're not

1  required to perform under these agreements.  And that is a

2  decision left within the sound judgment and discretion of the

3  debtor.

4        And I look at it right now and I am certainly

5  obliged under the case law to defer to the debtor's business

6  judgment in this regard and to do otherwise, particularly

7  here, would require me to substitute my judgment for theirs

8  on a factual record that does not necessarily give me

9  confidence that I know better.  I would observe, as I said at

10  the outset, that the debtor may be taking a risk.  The debtor

11  has an asset.  That asset is the Boeing contract or the

12  collection of contracts.  It has chosen to reject them.

13  There are consequences to that, as noted in Boeing's papers.

14  Rejection will give rise to a rejection damages claim that

15  will have to be treated under a plan under Section 365 and

16  confirmable under a plan.  So, that's an issue, again, that

17  Boeing, I think, has properly raised and that the Court has

18  seen in other circumstances.

19        But in this instance, as Mr. Wilkins noted, the

20  testimony is that the debtors have not entered into this

21  lightly, that Mr. Richardson's testimony reflects that a

22  significant review and analysis and consideration of this

23  agreement and what to do about it was undertaken on a

24  prepetition and on a post-petition basis.

25        I certainly don't fault either party for not

1   agreeing to modify the terms of the contract.  A contract is

2   a contract.  And while people may come in and say, I would

3   like to modify this, the counterparty is entirely within its

4   rights to say, I've got a signed document and I'm not obliged

5   to change it.  So be it.

6          But at that point, again, in the context of a

7   Chapter 11 case, the debtor has a tool available to it that

8   doesn't exist outside of bankruptcy, and that is the tool of

9   rejection.

10          So, I am satisfied that the relief requested is

11   appropriate and warranted on the record before me,

12   considering the testimony that's been adduced and I would be

13   prepared to enter an order approving the rejection of the

14   claim.

15          I note further the parties, I think, have cited to

16   the Orion case.  There's been no discussion of rejection

17   damages, but I think that case teaches that if there are

18   issues with respect to or more complex legal issues with

19   respect to the effects of rejection and calculation of claim,

20   et cetera, those are typically reserved for further

21   proceedings.

22          There's a narrow question in front of me today:

23   Is the debtor authorized under Section 365 of the Code, to

24   reject these agreements in the exercise of its business

25   judgment?

1          The answer I am provided today is "yes."  I'll

2    look for that order under certification.

3          Are there any questions?

4          (No verbal response)

5          THE COURT:  All right.  I appreciate everyone's

6    time and I, again, appreciate you accommodating my schedule.

7          Safe travels, all.  We're adjourned.

8          COUNSEL:  Thank you, Your Honor.

9        (Proceedings concluded at 3:46 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                  September 8, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                  September 8, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                   September 8, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25